RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0149P (6th Cir.)
File Name: 03a0149p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

ANDY RIDGE (01-6505);
DANNY BAKER (01-6602),
  *Defendants-Appellants.*

Nos. 01-6505/6602

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 00-00122—Curtis L. Collier, District Judge.

Argued and Submitted: March 11, 2003

Decided and Filed: May 19, 2003

Before: MOORE and CLAY, Circuit Judges; LAWSON,
District Judge.*

---

\* The Honorable David M. Lawson, United States District Judge for
the Eastern District of Michigan, sitting by designation.

---

## COUNSEL

**ARGUED:** Barry L. Abbott, CAVETT & ABBOTT, Chattanooga, Tennessee, for Appellant. Paul W. Laymon, Jr., ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Barry L. Abbott, CAVETT & ABBOTT, Chattanooga, Tennessee, Jerry H. Summers, Jimmy FS. Rodgers, Jr., SUMMERS & WYATT, Chattanooga, Tennessee, for Appellants. Paul W. Laymon, Jr., ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Andy Ridge ("Ridge") appeals his conviction for possession of a firearm during a drug trafficking offense, and Defendant-Appellant Danny Baker ("Baker") appeals his sentence for conspiracy to manufacture methamphetamine. Officers stopped a van driven by Baker and Ridge as it approached the site of a known methamphetamine laboratory where the officers were conducting a search. One officer had intercepted a phone call twenty minutes earlier, and was told, "Danny's on the way with the money." Joint Appendix ("J.A.") at 240 (Prichard Test.). After Ridge was removed from the van, officers seized a firearm that was sitting on Ridge's seat. Ridge filed a motion to suppress all evidence gathered as a result of the stop. The district court denied the motion, and Ridge was convicted on a conditional guilty plea to possessing a firearm during a drug trafficking offense. He appeals his conviction on the ground that the firearm should have been suppressed. Because the officers had a reasonable, articulable suspicion sufficient to justify a stop, we **AFFIRM** Ridge's conviction.

Baker pleaded guilty to conspiracy to manufacture methamphetamine and was sentenced to 188 months of imprisonment. At sentencing, the government moved for a downward departure for substantial assistance pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 5K1.1 and Baker moved for downward departures pursuant to U.S.S.G. § 4A1.3, on the ground that his criminal status as a career offender significantly over-represented the seriousness of his criminal history, and U.S.S.G. § 5K2.0, based on the totality of the circumstances. The district court granted the § 5K1.1 motion, departing downward three levels, but denied Baker's motions. Baker appeals both the extent of his § 5K1.1 departure and the district court's failure to depart pursuant to § 4A1.3 and § 5K2.0. Because the district court properly exercised its discretion under § 5K1.1, we cannot review the extent of the § 5K1.1 downward departure. Moreover, because the district court was aware of its authority to depart downward under § 4A1.3 and § 5K2.0, the district court's refusal to depart downward on these grounds is not reviewable.

## I. FACTS AND PROCEDURE

### A. The Stop of Ridge and Baker

A confidential informant told Officer Chris Nicholson ("Nicholson") of the Red Bank Police Department in Red Bank, Tennessee, that Thomas Stocklem ("Stocklem") was operating a methamphetamine laboratory in his residence. Nicholson secured a search warrant for Stocklem's home and several officers executed the search on July 2, 2000, at approximately 8:30 p.m. During the search, which lasted until early July 3, officers discovered a methamphetamine laboratory and items associated with its operation in Stocklem's basement.

While the officers were executing the warrant, Stocklem received a call on his cellular phone. Detective Bobby Prichard ("Prichard") answered the phone and heard "what appeared to be a male voice on the telephone that said 'Danny's on the way with the money.'" J.A. at 240 (Prichard

Test.). Prichard told the caller, "Okay, we'll be waiting," before the call was disconnected. J.A. at 240 (Prichard Test.). When Prichard related the conversation to the other officers, Lieutenant Dan Dyer ("Dyer") and Detective Mark King ("King") said the caller may have been referring to Danny Baker. Nicholson's informant had mentioned Baker on several occasions, stating that Baker cooked methamphetamine in Stocklem's laboratory. King advised the others that he knew that Baker had been armed during a previous arrest.

Several officers exited the residence and hid themselves in the area surrounding the driveway. About twenty minutes after the phone call, a van entered Stocklem's driveway. Baker was driving, and Ridge was in the passenger seat. Officers moved in behind the van and followed it until it stopped. The officers removed Baker and Ridge from the vehicle.

As Ridge exited the van, Nicholson observed a Ruger 9 millimeter semiautomatic pistol on the passenger seat, where Ridge had apparently been sitting on it. Nicholson announced "Gun." J.A. at 232 (Nicholson Test.), 252 (Dyer Test.). Once Baker and Ridge were out of the vehicle, officers also observed a blue light similar to those used on unmarked police cars, plastic tubing, electronic scales, and a torch. Baker was in possession of a bag containing a white substance and, according to the police, several hundred dollars.[1]

Baker and Ridge claim that they had an innocent purpose for going to Stocklem's house. Baker's sister, Allison Turner ("Turner"), had left a car at Stocklem's house for repairs a month earlier. On July 2, someone allegedly called Turner and told her "that somebody was up there fooling with [her] car" and she should "come and see what was going on about it." J.A. at 257 (Turner Test.). When Turner asked Baker to check on the car, he "said that he would go get [Ridge] and go

---

[1] Baker maintains that he only had six dollars in his possession at the time. The money was not listed on the police inventory of items seized.

over there and look." J.A. at 257 (Turner Test.). After Baker's arrest, Turner picked up the car herself. It had not been repaired.

Ridge filed a motion to suppress all evidence seized as a result of the officer's stop of the van. The magistrate judge conducted an evidentiary hearing, and recommended that the motion be denied:

> [G]iven the information the officers had about Danny Baker carrying a gun in the past, his involvement in methamphetamine, and the fact that drug dealers often carry weapons, the officers had a reasonable belief, based on specific and articulable facts, that the occupants of the van might be armed and dangerous.

J.A. at 75 (Magistrate Judge's Report & Rec.). The district court adopted the magistrate's recommendation.

Ridge then pleaded guilty to possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), and conspiracy to manufacture fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). He was sentenced to 180 months of imprisonment, sixty months of which are attributable to the firearm conviction. Pursuant to his conditional guilty plea, Ridge appeals his conviction for possession of a firearm in furtherance of a drug trafficking crime on the ground that the district court erred in denying his motion to suppress because the stop of the vehicle violated his Fourth Amendment rights.

## B. Baker's Sentencing

Baker pleaded guilty to conspiracy to manufacture fifty grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 846. Before sentencing, Baker filed several objections to his presentence investigation report ("PSR"), which recommended that he be classified as a career offender and assigned an adjusted offense level of 37. He filed a motion for a downward

departure, arguing that his career offender status over-represented the seriousness of his criminal history. He subsequently filed a supplemental motion for a downward departure based on his post-conviction drug rehabilitation. The United States moved for a § 5K1.1 downward departure for substantial assistance and filed a supplemental motion describing Baker's testimony before a federal grand jury.

At sentencing, the district court found that Baker was a career offender and that his offense level was 37. The parties then argued their downward departure motions before the court. The government summarized Baker's assistance thus far and indicated that Baker would likely be used as a witness in cases that were already pending or would be brought in the future. The following colloquy occurred:

| | |
|---|---|
| Court: | And should he render substantial assistance in those cases, would you anticipate filing a motion pursuant to Rule 35? |
| Government: | I would, Judge. Of course, as the Court is clear — as the Court well knows, you know, we can't consider his future assistance or the possibility of his future assistance in assessing the 5K. But to answer your questions, yes, you know, I would anticipate those events occurring. |

J.A. at 314 (Sentencing Tr.).

The district court denied Baker's motions for downward departure, but granted the government's § 5K1.1 motion for a downward departure. The court reduced Baker's guideline range from 262-327 months to 188-235 months, departing downward two levels for his "general cooperation" and one additional level for his "testimony before the grand jury." J.A. at 326 (Sentencing Tr.). Baker was sentenced to 188 months of imprisonment. He appeals his sentence.

## II. ANDY RIDGE:  MOTION TO SUPPRESS

Ridge argues that the district court erred in denying his motion to suppress the firearm because the stop violated his Fourth Amendment rights.  When reviewing a district court's ruling on a motion to suppress, we review legal conclusions de novo and findings of fact for clear error.  *United States v. Fullerton*, 187 F.3d 587, 590 (6th Cir. 1999), *cert. denied*, 587 U.S. 1127 (2000).  Thus, we review de novo the district court's conclusion that the stop was constitutional, while giving "due weight to inferences drawn from [historical] facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

When an officer conducts a brief investigatory stop of a person or vehicle, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted); *cf. Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (noting that an officer conducting an investigatory stop "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity" (quotations omitted)). In reviewing a reasonable suspicion determination, we consider the "totality of the circumstances" to determine whether the detaining officers had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *see Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (explaining that an officer's actions are "judged against an objective standard:  would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (citation omitted)).  It is inappropriate to examine each individual circumstance in isolation; rather, they must be considered in their totality.  *United States v. Orsolini*, 300 F.3d 724, 728 (6th Cir. 2002).  Moreover, as long as "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger," an officer need not be certain that an

individual is armed.  *Terry*, 392 U.S. at 27.  Officers "need not rule out the possibility of innocent conduct" to have reasonable suspicion.  *Arvizu*, 534 U.S. at 277.

This court has concluded that *Terry* stops conducted under similar factual circumstances were justified by reasonable suspicion.  In *United States v. Barrett*, 890 F.2d 855 (6th Cir. 1989), a panel of this court concluded that an officer had reasonable suspicion to conduct an investigatory stop where someone drove up to a residence that the officer had just finishing searching.  *Id.* at 860-61.  The officer knew that a drug dealer lived in the residence, the residence was a distribution point for other dealers, couriers frequently made deliveries there, and the delivery of a specific quantity of drugs was expected at that time.  *Id.*  Finally, the officer observed the driver's suspicious demeanor.  *Id.* at 861.  The totality of these circumstances established reasonable suspicion sufficient to justify a stop.

In this case, the officers were executing a search warrant in a residence housing a methamphetamine laboratory where Danny Baker was known to cook methamphetamine. Like the officer in *Barrett*, these officers were awaiting the arrival of something — not an expected delivery, but a man named "Danny" — because they had intercepted a phone call in which the caller "said 'Danny's on the way with the money.'" J.A. at 240 (Prichard Test.).  Two officers stated that the "Danny" referred to by the caller might be Danny Baker, who, they had learned from an informant, had cooked methamphetamine at the drug laboratory they were searching. A third officer said Baker had been armed during a previous arrest.  Thus, when the van drove up to Stocklem's residence approximately twenty minutes after the anonymous phone call, the officers had reasonable suspicion that one of the men was "Danny" and that he had come to Stocklem's residence to traffic in methamphetamine.  Although the officers did not have an opportunity to observe Baker's behavior before they effectuated the stop, they had strong reason to believe that a specific individual known to cook methamphetamine at that location was scheduled to arrive.

Moreover, "[t]he possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances." *United States v. Bohannon*, 225 F.3d 615, 617 (6th Cir. 2000) (quotation omitted). In *Bohannon*, a panel of this court explained that because the officers were searching a suspected methamphetamine lab, "an officer could reasonably infer that a customer or distributor would arrive on the premises. The agents had reasonable suspicion that [he] was involved in criminal activity." *Id.* This suggests that, even if the officers did not have specific reason to know that "Danny" would be arriving with money shortly, they may have been justified in stopping individuals who approached the residence that they were searching.

In light of *Bohannon* and *Barrett*, we affirm the district court's denial of Ridge's motion to suppress. The officers had a reasonable, articulable suspicion sufficient to justify a stop, which led naturally to the discovery of the weapon in plain view when Baker exited the van.

## III. DANNY BAKER: MOTIONS FOR DOWNWARD DEPARTURE

### A. Section 5K1.1 and Federal Rule of Criminal Procedure 35

Baker argues that we should vacate his sentence and remand for re-sentencing because the district court considered the possibility of a post-sentencing Federal Rules of Criminal Procedure Rule 35 motion when ruling on the government's § 5K1.1 motion at sentencing. The government claims that Baker is actually challenging the extent of his downward departure, which generally is not reviewable on appeal. *United States v. Nesbitt*, 90 F.3d 164, 166 (6th Cir. 1996). We ordinarily do not have jurisdiction to evaluate the appropriateness of a § 5K1.1 departure, but we have jurisdiction to determine whether a district court's reduction of a sentence "represents the exercise of discretion envisioned

by USSG § 5K1.1." *United States v. Bureau*, 52 F.3d 584, 595 (6th Cir. 1995).

Pursuant to § 5K1.1, a sentencing judge may sentence a defendant below the applicable guideline range if the defendant has provided substantial assistance in the investigation and prosecution of others. U.S.S.G. § 5K1.1. Rule 35 allows a district court to re-sentence a defendant to reflect substantial assistance rendered after the initial sentence was imposed. Fed. R. Crim. P. 35. We will vacate a defendant's sentence and remand for re-sentencing where the district court "look[ed] to a potential Rule 35 motion" in ruling on a § 5K1.1 motion:

> [T]he matter of sentencing is remanded for reconsideration by the district court who we expect will inform us as to whether or not the . . . downward departure fully comprehended the grounds stated by the government in making the § 5K1.1 motion or whether the district court knew the bounds of its discretion, yet chose to "keep the carrot dangling just out of [the defendant's] reach, thereby continuing the incentive that prompted his pre- sentence cooperation into the post-sentence period."

*Bureau*, 52 F.3d at 595 (citation omitted). Under the guidelines, "the sentencing judge has an obligation to respond to a § 5K1.1 motion and to then state the grounds for action at sentencing without regard to future events." *Id.* Therefore, "the prospect of Rule 35(b) relief in the future cannot be allowed to alter or influence the decisions of the prosecution, or the deliberations of the court, at sentencing." *United States v. Drown*, 942 F.2d 55, 59 (1st Cir. 1991).

Other circuits have recognized that a district court is required to rule on a § 5K1.1 motion at sentencing and cannot hold the motion open until after sentencing. *See United States v. Mitchell*, 964 F.2d 454, 461 (5th Cir. 1992); *United States v. Howard*, 902 F.2d 894, 897 (11th Cir. 1990). The government should not defer its determination about the substantiality of a defendant's assistance until after sentencing

even where it seems premature to assess the assistance: "At the time of sentencing, a yes-or-no decision must be made on whether to file a section 5K1.1 motion; and that decision must be based on a good faith evaluation of the assistance rendered to that date." *Drown*, 942 F.2d at 59 n.7. Deferring a ruling on a motion for downward departure under § 5K1.1 until after sentencing may violate Rule 35's limitation on the district court's authority to reduce a previously-imposed, valid sentence to cases in which the government makes an appropriate motion within the prescribed time period.

*Bureau* requires us to seek certain assurances "from a reading of the record that the discretion vested in the sentencing judge has been exercised rather than partially 'reserved' for a future time. Only then can we determine whether the sentencing judge abused the discretion which he has exercised." *Bureau*, 52 F.3d at 595. In *Bureau*, after inquiring about the possibility of post-sentencing departures at sentencing, the district court explicitly stated "that the Court's downward departure will take into account the possibility that there may be a further reduction later on pursuant to a Rule 35 motion." *Id.* at 588. In light of that statement, this court decided that the district court had obviously misconstrued the nature of its discretion under § 5K1.1.

A district court's mere mention of possible future cooperation or the possibility of filing a Rule 35 motion alone will not invalidate the district court's ruling on a motion for a downward departure under § 5K1.1 at sentencing. When a defendant challenges the sentencing court's ruling on appeal on the ground that the district court's contemplation of future cooperation contaminated its decision, our task is to examine the text and context of the record to determine whether "the prospect of Rule 35(b) relief in the future . . . alter[ed] or influence[d] . . . the deliberations of the trial judge, at sentencing." *Id.* at 595 (quoting *Drown*, 942 F.2d at 59). Only then can we assess whether the district court improperly attempted to extend its discretion to reduce a sentence below

the Guideline range into the post-sentencing realm of Rule 35(b).

At Baker's sentencing, the district court engaged in a colloquy with the government about the possibility of Baker's continued cooperation after sentencing. The government said that it anticipated such cooperation and would file a Rule 35 motion in the event of such cooperation, but reminded the court that it would be inappropriate to consider the possibility of future assistance at sentencing: "as the Court well knows, you know, we can't consider his future assistance or the possibility of his future assistance in assessing the 5K." J.A. at 314 (Sentencing Tr.). After the government and Baker described Baker's assistance thus far, the district court granted the § 5K1.1 motion for a downward departure. Later, the court carefully considered the appropriate extent of the departure in light of "the assistance given," departing downward two levels for Baker's general cooperation, which "indirectly led to the guilty pleas of [his] co-defendants," and one level for Baker's grand jury testimony about "how this particular type of offense, that is, methamphetamine manufacturing, takes place. . . ." J.A. at 325 (Sentencing Tr.). *After* ruling on the § 5K1.1 motion, the district court again mentioned the possibility of a post-sentencing reduction pursuant to Rule 35, indicating that "should the government file a Rule 35 motion based upon your substantial assistance in other cases, the Court will look very favorably upon that." J.A. at 326 (Sentencing Tr.). Specifically, Baker was told, "you can expect yet a further reduction in your sentence should that occur." J.A. at 326 (Sentencing Tr.).

Baker argues that the sentencing transcript shows that the district court withheld at sentencing additional discretion conditioned on Baker's future cooperation. But unlike the district court in *Bureau*, which explicitly accounted for future reductions when ruling on a § 5K1.1 motion, here the district court simply referred to the possibility that the government might move for an additional reduction of sentence after sentencing if Baker continued to provide substantial assistance. The district court did not reserve or intend to

reserve its discretion over sentencing. Moreover, there is no indication that the district court was trying to preserve its discretion to depart downward until after sentencing because the court recognized that any future reduction would depend entirely upon the government's decision to file a Rule 35 motion. Therefore, we conclude that the district court did not improperly exercise its authority under § 5K1.1 by considering the possibility of a post-sentencing reduction.

## B. Section 4A1.3:  Baker's Criminal History Category

Pursuant to U.S.S.G. § 4B1.1(a), the district court classified Baker as a career offender because he had two prior felony convictions for controlled substances offenses. *See* U.S.S.G. § 4B1.2, commentary, applic. note 1 (defining a prior felony conviction as "a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed").  Baker does not argue that the district court erred by classifying him as a career offender, but claims that the district court should have departed downward because his criminal history category significantly over-represented the seriousness of his prior criminal conduct in light of four factors:  Baker was young at the time of convictions; the offenses involved only marijuana; the crimes were in the least serious class of felonies in Tennessee; and his twenty-four month sentence for each conviction was suspended.

The guidelines recognize the possibility that the criminal history category assigned to a defendant may "not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." *Id.* § 4A1.3.  This includes cases where the criminal history category "significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." *Id.* § 4A1.3; *see United States v. Smith*, 278 F.3d 605, 611 (6th Cir. 2002) ("[S]entencing judges have the discretion to determine that a defendant's criminal history category may overstate his actual

criminal history based on the fact that his predicate drug convictions involved small amounts of narcotics.").  At sentencing, the district judge denied Baker's motion for departure on this ground.

Generally, we do not review a district court's refusal to exercise its discretion to grant a downward departure. *United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995).  However, we do have jurisdiction to review a district court's belief "that it lacked any authority to depart downward as a matter of law." *United States v. Ebolum*, 72 F.3d 35, 37 (6th Cir. 1995).  We review de novo whether the district court was aware of its authority to make a downward departure, examining the transcript of the sentencing hearing to make this determination. *Id.*  We presume that the sentencing court has properly exercised its discretion when it decides that a departure is not warranted, as "there is no duty on the trial judge to state affirmatively that he knows he possesses the power to make a downward departure, but declines to do so." *Byrd*, 53 F.3d at 145.

In *Smith*, the Sixth Circuit remanded a case for re-sentencing in light of the fact that the district court may have been unaware of its authority to depart downward when a career offender's criminal history category overrepresents his actual criminal history.  278 F.3d at 611.  It was unclear whether the district court was aware of this authority at sentencing because of "the sentencing judge's contention that he was bound by Congress' decision to punish severely repeat offenders, whether he agreed with that decision or not, along with his declaration that he was imposing 'the bare minimum' that he could." *Id.*  This court has subsequently distinguished *Smith* in an unpublished order:

In *Smith*, we were unable to discern from the record whether the district court was aware of its authority to depart. . . . In addition, the applicability of *Smith* was limited to the specific facts of that case; the most salient fact being that the sentencing court stated that it imposed

the "bare minimum" sentence that it was authorized by law to impose.

*United States v. Blanco*, No. 02-1330, 2002 WL 31472441, at **1 (6th Cir. Nov. 1, 2002) (Order).

The sentencing judge in Baker's case was the same judge who in *Smith* failed to recognize his authority to depart downward where a career offender's criminal history category significantly overrepresented the seriousness of his criminal history. Baker's argument turns on two comments made by the sentencing judge: (1) "a sentence at the low end of the guideline range is more than adequate here," and (2) "you are still looking at about 15 years in jail, and the Court believes that that is more than sufficient for the offense for which you stand convicted." J.A. at 328 (Sentencing Tr.). Baker suggests that these statements are comparable to the sentencing judge's statement in *Smith* that he was sentencing Smith to "the bare minimum" he could. 278 F.3d at 611.

In this case, the district judge's statements may indicate that he thinks the sentence high for Baker's crime, but they do not indicate that he was unaware of his discretion to depart downward. Baker specifically told the court that his motions for downward departure could be considered individually or as a totality of the circumstances. He cited cases from the Third, Ninth, and Tenth Circuits as support for the court's discretion to depart downward where a defendant's career offender status significantly overrepresents the seriousness of the defendant's criminal history and offense level. The government did not challenge the authority of the sentencing court to depart downward, and the court never expressed any doubt about the extent of its discretion. In fact, the government responded to the merits of Baker's argument, explaining that "putting him at a Level 37 as a criminal offender is not overstating his very serious background." J.A. at 320 (Sentencing Tr.). Because the district judge heard all of Baker's motions for a downward departure, did "not find that Mr. Baker's case is atypical" or "outside the heartland of cases described in the guidelines," and even granted the

government's § 5K1.1 motion for downward departure, there is ample reason for us to conclude that the district judge was aware of his authority to depart downward if Baker's criminal history category over-represented his actual criminal history. In light of this evidence, we do not consider it appropriate to consider in this case the same district judge's unawareness of his discretion to depart downward for this reason at an earlier sentencing hearing in another case. Because nothing in the record indicates that the sentencing judge was unaware of his discretion to depart downward under § 4A1.3, we cannot review the district court's exercise of discretion in denying this departure.

## C. § 5K2.0 Departure

Finally, Baker asks us to review the district court's refusal to grant a downward departure pursuant to § 5K2.0. The sentencing guidelines provide:

> Under 18 U.S.C. § 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

U.S.S.G. § 5K2.0. The guidelines also "explicitly acknowledge that a combination or aggregation of factors could distinguish a case from the 'heartland' of cases." *United States v. Coleman*, 188 F.3d 354, 361 (6th Cir. 1999) (en banc); U.S.S.G § 5K2.0, commentary. Baker argues that the district court failed to appreciate the exceptional significance of the following mitigating circumstances, the totality of which he claims merit a downward departure under § 5K2.0: (1) Baker's criminal history category over-represented the seriousness of his criminal history; (2) his addiction to methamphetamine was the driving force behind his crime; (3) the three-level downward departure did not adequately reward his substantial assistance to the

government; and (4) he made extraordinary efforts at post-offense rehabilitation, which suggests a lower likelihood of recidivism.

After hearing Baker's arguments about these mitigating circumstances, the court denied Baker's motion for a § 5K2.0 departure: "The Court does not find that Mr. Baker's case is atypical; that is, the Court does not find that his case is outside the heartland of cases described in the guidelines." J.A. at 324 (Sentencing Tr.). Baker argues that because the district court singled out Baker's efforts at rehabilitation, we should conclude that the district court was unaware of its authority to depart in light of the other three factors identified by Baker. As explained above, we do not review a district court's refusal to grant a downward departure, *Byrd*, 53 F.3d at 145, unless the court erroneously believed that it did not have the authority to depart downward. *Wells*, 211 F.3d at 1003. We review de novo whether the district court was aware of its authority to make a downward departure, examining the transcript of the sentencing hearing to make that determination. *Ebolum*, 72 F.3d at 37. The district court is presumed to have properly exercised its discretion when it decides that a departure is not warranted, meaning that it need not affirmatively recognize its power to make a downward departure when it declines to do so. *Byrd*, 53 F.3d at 145.

At sentencing, Baker made several arguments supporting departure and the government responded to each of them. The district court then quoted extensively from a Sixth Circuit case, *United States v. Reed*, 264 F.3d 640 (6th Cir. 2001), *cert. denied*, 535 U.S. 962 (2002), which explains the grounds upon which a sentencing court can depart downward pursuant to § 5K2.0:

The Guidelines Manual provides that a sentencing court should "treat each guideline as carving out a heartland, a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm,

the court may consider whether a departure is warranted."

J.A. at 323 (Sentencing Tr.) (quoting *Reed*, 264 F.3d at 646). The court also explained that "'certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the guideline,'" and that it would consider even factors not mentioned by the guidelines in the context of the structure and theory of the guidelines. J.A. at 323 (Sentencing Tr.) (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)). As the government argues, this discussion of *Reed* and the guidelines suggests that the district court was fully aware of its authority to grant a downward departure and simply decided that a departure would not be appropriate under the circumstances. Therefore, we cannot review the district court's decision not to depart downward pursuant to § 5K2.0.

## IV. CONCLUSION

For the reasons explained above, we **AFFIRM** Ridge's conviction. We cannot review the extent of Baker's § 5K1.1 downward departure, or the district court's refusal to depart downward under § 4A1.3 and § 5K2.0 at sentencing; on that basis we **AFFIRM** Baker's sentence.