RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0332P (6th Cir.)
File Name: 04a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            *v.*

            No. 03-6046

SENECA SANDRIDGE,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 02-00049—Curtis L. Collier, District Judge.

Argued: August 12, 2004

Decided and Filed: September 30, 2004

Before: MOORE and COLE, Circuit Judges; MARBLEY,
District Judge.[*]

_____

## COUNSEL

**ARGUED:** Nikki C. Pierce, FEDERAL DEFENDER
SERVICES OF EASTERN TENNESSEE, Greeneville,

_____

[*] The Honorable Algenon L. Marbley, United States District Judge for
the Southern District of Ohio, sitting by designation.

---

Tennessee, for Appellant. Steven S. Neff, ASSISTANT
UNITED STATES ATTORNEY, Chattanooga, Tennessee,
for Appellee. **ON BRIEF:** Nikki C. Pierce, FEDERAL
DEFENDER SERVICES OF EASTERN TENNESSEE,
Greeneville, Tennessee, for Appellant. Steven S. Neff,
ASSISTANT UNITED STATES ATTORNEY, Chattanooga,
Tennessee, for Appellee.

_____

## OPINION

_____

R. GUY COLE, JR., Circuit Judge. Defendant-Appellant,
Seneca Sandridge, brings this appeal following his plea of
guilty to one count of possession with intent to distribute
cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and
(b)(1)(B). Sandridge appeals the district court's denial of his
motion to suppress evidence that was seized from his vehicle
and person pursuant to a traffic stop on March 27, 2002.
Sandridge also appeals the sentence imposed by the district
court; he contends that the district court erred when, for drug
quantity determination purposes, it converted $919 in cash
seized from him at the time of his arrest into an equivalent
amount of cocaine base.

For the reasons discussed below, we **AFFIRM** the denial
of Sandridge's motion to suppress. However, we **VACATE**
the sentence imposed by the district court and **REMAND** the
case to that court for re-sentencing based on a base offense
level reflecting only the amount of drugs possessed by
Sandridge.

## I. THE SUPPRESSION MOTION

On March 27, 2002, Officer Phillip Grubb of the
Chattanooga Police Department observed Sandridge driving
a yellow Cadillac in downtown Chattanooga, Tennessee. At
the first evidentiary hearing held by the magistrate judge,

Officer Grubb testified that "a day or two" earlier, he had seen Sandridge driving in the same vehicle and had run a license check on the mobile data terminal ("MDT") – a police-wired laptop – in his patrol car. At a second evidentiary hearing, Grubb testified that he was not sure of the exact day he conducted the license check and that he might have conducted it a few weeks before the March 27 stop, rather than a few days earlier, as he previously testified. In any event, Grubb testified that the license check revealed that Sandridge did not have a valid driver's license. Accordingly, when Officer Grubb saw Sandridge driving in Chattanooga again, on March 27, 2002, he stopped him on the suspicion that he was still driving without a valid license. At this point, Grubb ran another license check, which confirmed that Sandridge was, indeed, still driving without a valid license.

While Officer Grubb was checking Sandridge 's license, another officer arrived on the scene. The two officers then approached Sandridge and asked him to get out of the car. Sandridge refused and attempted to restart the engine and drive off, at which point an altercation ensued between Sandridge and the police officers. Eventually, Sandridge was arrested for driving without a valid driver's license and resisting arrest. The officers then searched the vehicle and Sandridge. In the car, they found 20.9 grams of cocaine base, a set of electronic scales, and marijuana. (The marijuana appears never to have been part of this federal action). In addition, the officers found $919 in cash on Sandridge's person.

Sandridge attacked Grubb's credibility with respect to Grubb's contention that he ran a license check on him prior to March 27. Specifically, Sandridge contended that there was no evidence that Grubb ran *any* license check prior to March 27. Brian Hackett, an investigator for the Federal Defender Service of Eastern Tennessee, testified at the first evidentiary hearing that he had obtained the MDT records from the Chattanooga Police Department for a two-week period prior to March 27, 2002, and that there was no record of a check on

Defendant's license during that time. Hackett also testified that he had spoken with Shirley Varner, Technical Services Operator for the Chattanooga Police Department, and that she told him that any check on Sandridge's license would have appeared on the MDT records.

At the second evidentiary hearing, Sandridge presented additional MDT records – this time, dating back to February 2002. These records, too, contained no indication that Officer Grubb had run a check on Sandridge's license prior to the one conducted on March 27, 2002, the day of the stop. When confronted with these computer records, Officer Grubb insisted that he had made an inquiry on Sandridge's license prior to March 27, 2002, although he was not sure why there was no record of it.

Despite the lack of evidence supporting Grubb's testimony, the magistrate judge found Grubb credible, and recommended denial of Sandridge's motion to suppress. The district court adopted the magistrate judge's recommendation to deny the motion to suppress, stating that "computers do make mistakes as anyone who has worked with them is well aware."

Sandridge then moved the district court to reconsider its denial of his suppression motion and explained that he had recently discovered new evidence – namely that, previously, no MDT record was submitted for March 5, 2002; instead, records for September 5, 2002 had been mistakenly submitted. When a printout of the MDT records for March 5, 2002 was obtained, it showed that a license check had, in fact, been run for Sandridge on March 5, 2002. There was no dispute before the district court that Officer Grubb ran that check.

Based on this new information, Sandridge renewed his attack on Grubb's credibility. He argued that the new evidence proved Grubb's lack of credibility, since Grubb testified that he had performed a license check "a day or two" before he stopped Sandridge on March 27, 2002, when the

check was actually performed twenty-two days before. (Puzzlingly, Sandridge fails to acknowledge Grubb's subsequent testimony that it may have been a few weeks before March 27 that he ran the check). In addition to attacking Grubb's credibility, Sandridge also argued that the March 5 license check was too "stale" to be relied on by Officer Grubb three weeks later, on March 27, 2002, when he pulled Sandridge over on the traffic stop.

The district court rejected both the credibility and staleness arguments, and adhered to its decision to deny Sandridge's motion to suppress. After Sandridge pleaded guilty to one count of possession with intent to distribute cocaine base, this timely appeal followed.

At issue is whether Officer Grubb had reasonable suspicion to stop Sandridge's car on March 27, 2002. As explained above, Grubb initially testified that he ran the license check a day or two before the stop; but at the second suppression hearing, Grubb testified that he was not certain of the date and may have run the check a few weeks before. Although initially, police records did not support Grubb's testimony that he ran a license check prior to March 27, 2002, the subsequently-uncovered MDT record showed that a license check was, in fact, run on Sandridge on March 5, 2002.

Before analyzing whether the March 5 check provided Officer Grubb with reasonable suspicion on March 27, we first address Sandridge's request for a new evidentiary hearing based on his insinuation – made for the first time on appeal – that the March 5 check might not have been conducted by Officer Grubb (but rather, by some other officer). There was never any dispute in the district court that Officer Grubb was the one to order the March 5 check. Indeed, in his motion for reconsideration, Sandridge made repeated representations that the March 5 license check was run by Officer Grubb. The following excerpt from Sandirdge's motion for reconsideration is but one example of that:

Officer Grubb did not take steps to further investigate by effecting a traffic stop on Mr. Sandridge on March 5, 2002. Prior to stopping Mr. Sandridge [on] March 27, 2002, Officer Grubb did not perform another license inquiry to ascertain the status of his license, instead he relied on the information from a check made three weeks earlier. Officer Grubb knew from the inquiry on March 5, 2002 that all Mr. Sandridge had to do was to go get his driver's license . . . .

The arguments in his brief on appeal are also based on the fact that Officer Grubb was the one who ran the March 5 check. For instance, Sandridge renews his argument that Grubb's March 5 search did not provide reasonable suspicion for the March 27 stop because, by March 27, the information gleaned on March 5 was "stale." Never does Sandridge contend that anyone other than Officer Grubb conducted the search. However, Sandridge's brief makes several vague and indirect references to the contrary, apparently to support his request for a supplemental evidentiary hearing based on the March 5 MDT record he presented in his motion for reconsideration.

Because such references contradict other arguments that Sandridge presents, we reject them as a basis for a new evidentiary hearing. "The case precedent in this circuit instructs courts to withhold judgment on issues not fully developed by the briefs or in the record. Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808, 823 (6th Cir. 2002) (internal quotations and citation omitted). More importantly, as already explained, the record leaves little question that it was Officer Grubb who ran the March 5 license check on Sandridge's car.

We now turn to the central legal question: Whether Officer Grubb had reasonable suspicion to stop Sandridge's car on March 27, 2002. This Court reviews *de novo* the district court's conclusion that the traffic stop was constitutional, giving due weight to the factual inferences drawn by the district court. *United States v. Ridge*, 329 F.3d 535, 540 (6th Cir. 2003).

When a police officer conducts a brief investigatory stop of a person in a vehicle, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). When Officer Grubb observed Sandridge driving on March 27, 2002, he reasonably suspected that he was driving without a valid license because, just three weeks earlier, on March 5, 2002, Grubb ran a license check on Sandridge's car and learned that he did not have a valid license. With respect to Sandridge's argument that Officer Grubb was not a credible witness because he first testified that the computer check was run a few days prior to the stop, we agree with the district court that the belatedly-discovered records of the March 5 check bolstered Officer Grubb's credibility, since Grubb testified all along that he ran a license check at some point prior to March 27, and, at the second suppression hearing, he specifically stated that the check might have occurred a few weeks before the stop, rather than a few days before. The documentary evidence, however, confirms that Grubb ran the check on March 5, 2002.

Sandridge also argues that, even assuming that Grubb was credible, any reasonable suspicion stemming from the March 5 license check was "stale" by the next time Officer Grubb saw Sandridge driving again, on March 27, 2002. We reject that argument. In situations where the criminal activity is of an ongoing nature, it will take longer for the information to become stale. *See United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."). Driving without

a valid license is a continuing offense – in contrast, say, to a speeding or parking violation – and there are no facts in the record suggesting that Officer Grubb should have assumed that Sandridge's ongoing offense had ceased between March 5 and March 27, 2002. Accordingly, Officer Grubb had a reasonable basis for suspecting that Sandridge still lacked a valid license on March 27 and, therefore, Grubb was permitted to stop Sandridge briefly to determine whether the crime was still being committed. *See United States v. Mans*, 999 F.2d 966, 968 (6th Cir. 1993) (holding that an officer's stop of a defendant was reasonable, and not pretextual, where the officer recognized the defendant from prior arrests and knew that his driver's license had been revoked).

For those reasons, we affirm the district court's denial of Sandridge 's motion to suppress evidence seized during the traffic stop of March 27, 2002.

## II. DRUG QUANTITY AND SENTENCING

Sandridge also challenges the sentence imposed by the district court. He contends that the district court erred when, for sentencing purposes and pursuant to U.S.S.G. § 2D1.1, it converted the $919 in cash seized from his person at the time of his arrest into an equivalent drug amount – 21.71 grams of cocaine base – and then added that to the 20.9 grams of cocaine base found in his car, leading to a total drug quantity finding of 42.61 grams of cocaine base. With that drug quantity finding, Sandridge's base offense level was 30. Sandridge contends that he should have been sentenced pursuant to a drug quantity finding of only 20.9 grams of cocaine base – that is, only the amount of cocaine base found in his car. This would have made his base offense level 28.

This Court reviews the district court's drug quantity finding – a factual finding – for clear error. *United States v. Keszthelyi*, 308 F.3d 557, 576 (6th Cir. 2002). We have held that when "the exact amount of drugs involved is uncertain, the court may make an estimate supported by competent

evidence," but the evidence supporting the estimate "must have a minimal level of reliability beyond mere allegation, and the court should err on the side of caution in making its estimate." *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir. 2000) (quotation omitted). The commentary to § 2D1.1 of the U.S. Sentencing Guidelines provides some guidance for estimating drug quantity:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.1, commentary, applic. note 12.

Applying those principles, we have previously approved the conversion of seized funds into an equivalent amount of drugs. *See United States v. Samour*, 9 F.3d 531, 537 (6th Cir. 1993), *overruled on other grounds by United States v. Reed*, 77 F.3d 139 (6th Cir. 1996); *United States v. Jackson*, 990 F.2d 251, 253 (6th Cir. 1993). In order to prove drug quantity by such a method, the Government must prove by a preponderance of the evidence both the amount of money attributable to drug activity and the conversion ratio – i.e., the price per unit of drugs. *Jackson*, 990 F.3d at 253.

A review of the sentencing transcripts reveals that the district court decided to convert the cash into an equivalent amount of cocaine base in reliance on information contained in the probation office's pre-sentence report ("PSR") – namely, that Sandridge is a "young man with no history of gainful employment who was found in possession of controlled substances plus a fairly large quantity of cash," as well as "some indications in his criminal history that he's been either charged [with] or convicted of drug offenses in the

past." In addition, the Government argued at sentencing – and continues to argue on appeal – that the $919 in cash was "about the same amount of money that could have bought about as much crack as he had with him on that day," and that that proves the money was proceeds from Sandridge's sale of other cocaine base or money to buy more cocaine base.

The district court erred, for several reasons. Even assuming, *arguendo* – based on Defendant's lack of gainful employment, his admitted drug dealing, and the sizable amount of cash – that the $919 was connected to some sort of drug business, the Government failed to show by a preponderance of the evidence that the money was connected to the purchase or sale of cocaine base other than the cocaine base found in Defendant's car. That is, the $919 in cash cannot be used as a proxy for an additional quantity of cocaine base above and beyond the quantity found in Defendant's car unless a preponderance of the evidence shows that the cash was either proceeds from other cocaine base that was just sold or money to purchase additional cocaine base. Moreover, in this case, a preponderance of the evidence would have to show that the money represented proceeds from or money to purchase cocaine base, as opposed to some other drug, such as marijuana, which was also found in Defendant's car.

At the sentencing hearing, the Government presented no witnesses and entered no documents into evidence; it relied entirely on the information in the PSR and asked the district court to do the same. Defendant only pleaded guilty to possessing with intent to distribute the 20.9 grams of cocaine base found in his car; there was no allocution by Sandridge – in either the plea agreement or at sentencing – concerning the purpose of the cash. Accordingly, the information relied on by the district court – i.e. that Defendant had no legitimate source of income in the years prior to his arrest and that he had a history of prior drug arrests – could suggest, at most, that Defendant was engaged in drug dealing, which he acknowledged in his guilty plea. But those facts shed no light

on the question of whether the $919 was related to cocaine base other than the cocaine base found in Defendant's car.

Of significance here is the fact that the Government believes that the $919 in cash was about the same amount of money that could have bought the amount of concaine base Sandridge had with him on March 27, 2002. Pursuant to the Government's logic, the almost-exact correlation between the $919 and the 20.9 grams of cocaine base found in Sandridge's car means one of two things: either (a) that the cash was proceeds from a previous sale of a similar quantity of drugs, or (b) that Sandridge intended to use the cash in the near future to purchase more drugs, of a similar quantity. Although those hypotheses are plausible, it is equally plausible that the cash was related to the 20.9 grams of equivalently-valued cocaine base found in Sandridge 's car: the cash may have been from a buyer to whom he was about to deliver the cocaine base or for a seller from whom he had recently procured it. The Government provided no evidence showing why its theories of the cash as a proxy for drugs-not-found should trump a theory that the cash was related to the equivalently-valued drugs found in Sandridge's car.

There was also no evidence – and no explicit finding by the district judge – that the drugs found in Defendant's car did not represent the full scale of the offense, as required by U.S.S.G. § 2D1.1, commentary, applic. note 12. In addition, no evidence was presented to show that the cash was related to the sale of cocaine base, as opposed to marijuana, the other drug found in Sandridge's car. For those reasons, the district court erred in converting the $919 in cash to 21.7 grams of cocaine base and in adding that to the 20.9 grams found in Sandridge 's car, for a total 42.61 grams of cocaine base. We hold that Defendant only should have been sentenced pursuant to a drug quantity finding of 20.9 grams of cocaine base.

Lastly, because this Court recently determined that *Blakely v. Washington*, 542 U.S. ___ (2004) does not invalidate the

sentencing scheme set forth in the U.S. Sentencing Guidelines, *see United States v. Koch*, No.02-6278 — F.3d —, 2004 WL 1899930 (6th Cir. Aug. 13, 2004) (en banc), we reject Defendant's *Blakely*-based arguments, which were presented to the Court in a supplemental briefing. However, Sandridge may, of course, raise any *Blakely* issues on remand to the district court in the event that an intervening decision from the United States Supreme Court renders them viable. *See United States v. Booker*, 04-104, — S. Ct. —, 2004 WL 1713654 (U.S. *cert. granted* Aug. 2, 2004) (mem.) and *United States v. Fanfan*, No. 04-105, — S. Ct. —, 2004 WL 171 3655 (U.S. *cert. granted* Aug. 2, 2004) (mem.).

### III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's denial of Defendant's motion to suppress but **VACATE** the sentence imposed by the district court and **REMAND** for re-sentencing consistent with this opinion.