# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 02-3132, 02-3320 & 02-3643

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*
*Cross-Appellant,*

v.

SECONDINO MEZA-URTADO,

*Defendant-Appellant,*
*Cross-Appellee.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JUAN FARIAS-MERAZ,

*Defendant-Appellee.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 01 CR 987-1,3—**Robert W. Gettleman**, *Judge.*

———————

ARGUED OCTOBER 31, 2003—DECIDED DECEMBER 8, 2003

———————

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* After Secondino Meza-Urtado filed an appeal from his conviction on drug charges, the government answered and filed a cross-appeal challenging a downward departure Meza received at sentencing. The government also tacked on an appeal of a similar downward departure granted to one of Meza's codefendants, Juan Farias-Meraz. Meza's appeal turned out to be especially bad news for Farias, as the government attorney told us at oral argument that an appeal of the downward departures may not have been undertaken had no direct appeal in the first instance been filed. This situation prompts us to recall the wisdom of our earlier advice that "defendants, who benefit from favorable calls under the federal sentencing guidelines, should think more than twice about appealing their cases when their appeals have little likelihood of success . . . because a defendant's appeal may draw a guidelines cross-appeal when the government would [probably] not . . . appeal on its own in the first instance." *United States v. Bradley*, 165 F.3d 594, 595 (7th Cir. 1999). *See also United States v. Martinson*, 37 F.3d 353 (7th Cir. 1994) (affirming conviction but finding clear error in reduction of offense level for acceptance of responsibility).

The facts of this case, very briefly, are that Meza had recorded telephone conversations regarding the sale of 3 kilos of cocaine at $23,000 per kilo. Meza and others, including Farias, arrived to sell the coke at a Kmart parking lot in Chicago. Farias was in the party "for protection." The deal went south because the purchasers turned out to be drug agents. Three kilos of cocaine were seized from a van involved in the aborted transaction.

Meza claims the evidence the jury heard was insufficient to convict him. He also raises related issues regarding what he sees as improper "leading questions" asked of Farias, who pled guilty to being involved in the drug deal and agreed to cooperate with the government by testifying

against Meza and a codefendant. Finally, Meza questions the government's use during his trial of the colloquy that took place in court when Farias entered his guilty plea.

It's very difficult for a defendant to convince an appellate court that the evidence presented to a jury was insufficient to support a conviction. For one thing, we view all evidence in the light most favorable to the government and uphold verdicts if any rational trier of fact could have found that the elements of a crime were established. *See United States v. Albarran*, 233 F.3d 972 (7th Cir. 2000). Stated another way, we will set aside a conviction only if "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Laurenzana*, 113 F.3d 689, 693 (7th Cir. 1997). The short answer to the first issue in this case is that there is no basis for disturbing the verdict on sufficiency of the evidence grounds. Meza's own words, most of which were recorded, his actions on the day of the aborted drug deal, and some post-arrest statements were more than sufficient for the jury to have concluded that he was guilty of the charged crimes.

The "leading questions" issue is similarly without merit. Meza contends that the government's use of leading questions during its direct examination of Farias and another witness, Ortega (a "confidential source" working with the government to get the goods on everyone involved in the drug deal), was "so suggestive and excessive" that it deprived him of his Sixth Amendment right of confrontation. We disagree. As for Ortega, only four instances of allegedly improper "leading questions" are noted. The challenged questions, we think, were not improper. All simply directed Ortega to explain the meaning and context of transcripts of taped conversations that were admitted into evidence.

Six allegedly "leading questions" were asked of Farias, and three drew no objection. None, we think, were improper

and all were necessary as Farias obviously became conveniently "forgetful" despite his agreement to help the government. In this situation, had the government asked, he could have been treated as a hostile witness and asked leading questions until the cows came home. *See* Fed. R. Evid. 611(c).

Although the questions asked of Ortega and Farias were not improperly leading, Meza would lose his appeal on this point even if they were because no objection to them was lodged, and thus our review would only be for plain error. *United States v. Bonner*, 302 F.3d 776 (7th Cir. 2002). He would lose because an objection to a question as "leading" is only an objection to the "form" of the question. If an objection is offered and sustained, the examiner simply rephrases the question and draws the desired information from the witness. Any reasonably good lawyer worth his salt can accomplish this little trick. Without a sustained objection, an examiner would never have a chance to rephrase his question. For this reason, we think error, plain or otherwise, could never be identified in a case where only the form of a question to which no objection is made is challenged on appeal.

In his related claim, Meza argues that it was error to admit Farias's plea colloquy into evidence. During the trial, Farias turned out to be a slippery witness. He testified, for example, that on the day of the drug transaction he and others, including defendant Meza, were only going to the Kmart lot to help a friend. He testified he was offered $200 for going and for providing protection during the errand. These statements were contrary to sworn statements he made when he pled guilty. At the district court's suggestion, rather than read his plea colloquy to the jury, the government first attempted to refresh Farias's recollection with his statements. It was the government's position that Farias's prior sworn statements, which were inconsistent with his trial testimony, could be used for more than just

refreshing his recollection, since they were admissible under Fed. R. Evid. 801(d)(1)(A). Outside the presence of the jury, Farias was read the testimony he gave when he entered his guilty plea. He then said his recollection was refreshed. But in front of the jury, he again testified inconsistent with his plea statements. For one thing, he did not acknowledge that the drug transaction was discussed on the way to the Kmart lot. Consequently, pursuant to Rule 801(d)(1)(A), the district court permitted the government to read the plea colloquy to the jury. In it, Farias admitted that a drug deal was to take place and that he was paid $200 for providing "protection." Because these sworn statements were clearly inconsistent with his trial testimony, they were properly received as substantive evidence. And because Farias could have been cross-examined at length about them, no Sixth Amendment Confrontation Clause is presented. This brings us to the final issue, the propriety of the downward departures ordered by the district court.

The downward departures here were not very dramatic. Meza's guideline range was 78 to 97 months. He received a one-level departure to a range of 70 to 87 months and drew a sentence at the bottom of the adjusted range. Farias got a 2-level reduction from a range of 46 to 57 months to a range of 37 to 46 months. His sentence was 37 months. Thus, the bottom-line adjustment for each averaged a mere 8½ months. Despite the fact that these departures were quite modest, they must be undone.

The downward departures were ordered because Meza and Farias are aliens (illegal ones at that) who will not receive certain "end of sentence" considerations (like a halfway house) that would be available to them if they were citizens of the United States. This perceived "disparate" treatment was ameliorated, according to the district court, by the sentence reduction it ordered.

The recent amendments to 18 U.S.C. § 3742, in what is commonly called the Protect Act, call for *de novo* review of downward departures, as we explained last month in *United States v. Mallon*, 345 F.3d 943 (7th Cir. 2003). The departures here cannot withstand the new, and heightened, standard of review. It's doubtful, moreover, if they could have been sanctioned even prior to the enactment of the Protect Act.

In *United States v. Guzman*, 236 F.3d 830, 834 (7th Cir. 2001), a defendant argued that a downward departure was permissible for one whose "status of being a deportable alien can affect the conditions of imprisonment, can make them harsher by disentitling a defendant to serve any part of his sentence in a halfway house, minimum security prison, or intensive confinement center [boot camp]." *Id.* We held that these circumstances are "a permissible basis, in exceptional circumstances, for a downward departure." *Id.* We explained:

> But we emphasize that the defendant's status as a deportable alien is relevant only insofar as it may lead to conditions of confinement, or other incidents of punishment, that are substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense.

Last year, in *United States v. Gallo-Vasquez*, 284 F.3d 780, 784-85 (7th Cir. 2002), we applied *Guzman* and reversed a downward departure based on deportable alien status because the district court failed to explain how any differences between the defendant's and a citizen's confinement conditions "made the defendant's sentence more onerous than was contemplated by the framers of the Sentencing Guidelines." *Id.* At 785. We remanded with instructions that "the district court examine the actual effects that Gallo-Vasquez's alien status will have upon his sentence and whether those effects will move Gallo-

Vasquez's sentence beyond the 'heartland' of cases contemplated by the framers of the Sentencing Guidelines when they crafted proposed sentences for defendants convicted of similar crimes."

Because this issue seems to be presenting itself with increasing frequency, we think it's time to make a more definitive statement: These downward departures are not permissible because denying certain end-of-sentence modifications (several months in a halfway house, for example) to illegal or deportable aliens cannot be viewed as a term of imprisonment "*substantially* more onerous" than the guidelines contemplate in fixing a punishment for a crime. Meza's and Farias's "conditions of confinement, or other incidents of punishment" will not be "substantially more onerous" than the guidelines contemplate as the punishment for their crimes of conviction. Indeed, their conditions of confinement will be exactly what their guidelines require, "a sentence of imprisonment." Under our *Guzman-Gallo* line of cases, we now hold that departures from the correctly established guideline range based merely on a defendant's status as a deportable alien are not authorized.

The principal error here is the assumption that a slight difference in end-of-sentence confinement conditions between citizens and aliens—without more—constitutes an appropriate ground for departure. Our cases have never so held. In *United States v. Farouil*, 124 F.3d 838 (7th Cir. 1997), we said only that a departure is warranted where a defendant's "status as a deportable alien . . . resulted in unusual or exceptional hardship in his conditions of confinement." At 847. In *Guzman*, the defendant raised basically the same grounds the district court relied on here—an alien's ineligibility to serve a short part of his sentence in a halfway house. We held that those grounds, individually or together, constituted a basis for departure only in the "exceptional circumstance[ ]" where the confine-

ment conditions "were substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense." The district court here, in effect, adopted Guzman's appellate argument and ignored our disposition of that argument. *See also Gallo-Vasquez*, 284 F.3d at 785.

The guidelines place Meza and Farias solidly in Zone D where the only sentencing option is imprisonment for a fixed period within a limited range. That the Bureau of Prisons (BOP) has certain programs for citizen-prisoners, but not deportable aliens, does not make the aliens' imprisonment substantially more onerous than the guidelines contemplated in fixing the punishment range for the offense of conviction.

The BOP's end-of-sentence policies like community confinement for a few months are in place to help "reintegrate" certain offenders back into society. That a deportable alien is not eligible for a program designed to "reintegrate" him back into American society does not make his imprisonment under the guidelines "more onerous." In fact, to cut a term of imprisonment—even as here by only 8 or 9 months—for a deportable alien when a citizen doesn't get the same shortened term would be discrimination in reverse.

For these reasons, the Meza judgment of conviction is AFFIRMED. The sentences of Meza and Farias are VACATED and their cases REMANDED for resentencing.

A true Copy:
    Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—12-8-03