In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-4538

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ADAM BABUL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 04 CR 548—**Joan B. Gottschall**, *Judge.*

ARGUED JANUARY 16, 2007—DECIDED FEBRUARY 9, 2007

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* Both the written and the
practical tests for commercial drivers' licenses in Illinois
are given only in English; the state does not allow transla-
tors to assist applicants. Adam Babul operated Bamba,
Inc., which offered a service to recent immigrants in
Illinois who wanted to drive trucks for a living but didn't
speak or write English: for $2,000, he would help them
secure licenses in Wisconsin, which allows translators to
accompany applicants. Babul's service employed deceit
from beginning to end. First he obtained bogus ad-
dresses for the applicants, so that they appeared to be
residents of Wisconsin (and thus eligible for licenses there)

even though they lived in Illinois. Second he recruited translators who told the applicants what answers to give, not just what the questions meant in their native tongues. Third Babul directed his clients to David Becker, who was authorized to administer over-the-road tests in Wisconsin. For a fee four times the lawful maximum for giving a road test, Becker promised to assign the applicants passing grades no matter how badly they drove. At least 200 people obtained commercial licenses through Babul's scheme, for which he has been convicted of violating 18 U.S.C. §1014. This statute forbids making false statements to banks and other financial institutions; the statements in question were used to obtain documents that falsely showed the applicants to be residents of Wisconsin. Babul has been sentenced to 41 months' imprisonment.

Although the evidence of guilt was overwhelming and the jury instructions impeccable, Babul contends that he is entitled to another trial because Magdalena Jelic, one of Babul's employees at Bamba who had detailed knowledge of its operations, testified for the prosecution without first taking an oath to tell the truth, as Fed. R. Evid. 603 requires. When the judge realized what had happened, she asked counsel how they wished to proceed. The Assistant United States Attorney suggested recalling Jelic and asking her under oath whether she stands by her answers. Babul's lawyer—apparently thinking that this procedure would just emphasize Jelic's testimony, which had been damaging to his client—formally waived any objection. He told the judge that he had no doubt that Jelic would reaffirm her testimony under oath, and that although he wanted the jury to disbelieve her story he saw no point in having her return to the stand. The judge accepted this waiver, and the trial proceeded.

Waiver means that there was no error; even plain-error review is unavailable. See *United States v. Olano*, 507 U.S.

725, 732-33 (1993). This leads Babul's appellate lawyer to contend that his trial lawyer lacked the authority to waive Jelic's return to the stand. Only the defendant personally may waive the requirement that testimony be taken under oath, Babul now maintains. Established doctrine has it that some rights are so important that only the defendant may waive them. The right to trial by jury is in this category; so is the right to testify in one's own defense. See *Rock v. Arkansas*, 483 U.S. 44 (1987); *Jones v. Barnes*, 463 U.S. 745 (1983); *Taylor v. United States*, 287 F.3d 658 (7th Cir. 2002). What these rights have in common is that exercising, bypassing, or using these rights as bargaining chips in negotiations with the prosecutor are the most important decisions in the case. The elections are discrete, and one does not need a legal education to appreciate the issues. By contrast, choices about trial practice and management—should a given witness's testimony be presented? should a hearsay objection be made? what language should be proposed for the jury instructions?—are committed to counsel, not only because they are numerous (asking the defendant each time would be impractical) but also because they are the sort of choices for which legal training and experience are most helpful. A defendant may act as his own advocate, see *Faretta v. California*, 422 U.S. 806 (1975), but when he chooses to have a lawyer conduct the defense, the lawyer gets to *conduct* the defense and not just whisper advice in the defendant's ear each time a decision must be made.

Babul insists that whether to allow testimony without an oath must be grouped with core decisions such as whether to testify (and whether to have a trial at all). As far as we can see, however, no appellate decision supports that proposition. Although the absence of authority (no appellate decision supports the prosecutor, either) may be attributable to the situation's rarity—not very often

will judge, court reporter, deputy clerk, and every lawyer in the courtroom overlook a failure to administer the oath—we are not at all tempted by Babul's invitation to establish a new principle. Babul observes that *United States v. Odom*, 736 F.2d 104, 115-16 (4th Cir. 1984), and *United States v. Wilcoxon*, 231 F.2d 384 (10th Cir. 1956), which treated counsel's waivers of the oath as conclusive, both noted that the defendant either approved counsel's decision or stood silent when counsel chose; in this case the record does not reflect whether defendant was present when his lawyer waived having Jelic recalled to the stand. To hold that a defendant's acquiescence is sufficient is not to imply that it is necessary, however.

Having a witness under oath facilitates cross-examination, which is part of the constitutional right to confront one's accusers. See *Wigmore on Evidence* §1362 at 10 (Chadbourn rev. 1974). But this relation between oath and cross-examination does not imply that decision-making rests exclusively in the accused's hands. After a witness testifies, counsel rather than the client decides whether to cross-examine, and, if so, what lines of inquiry to pursue. If counsel could have elected to limit or forego cross-examination of Jelic, he was equally entitled to forego placing Jelic under an oath that facilitates cross-examination. No appellate decision of which we are aware holds that the decision whether (and to what extent) to cross-examine a witness belongs exclusively to the defendant—and *this* absence of authority can't be chalked up to the fact that the subject rarely arises. Who decides about cross-examination is a question potentially at issue in *every* criminal trial. The check on counsel's decisions is not the defendant's assent at each step along the way, but the doctrine of ineffective assistance, which ensures that counsel's work as a whole satisfies professional standards. Babul does not contend that trial counsel furnished substandard assistance; we think it likely,

however, that if counsel *had* demanded that Jelic return to the stand, Babul would now be arguing that counsel undermined his case by enabling the prosecutor to rein-force damaging evidence against him.

The remaining arguments concern two sentencing adjustments—one the district court made and one it did not. The one not made is a reduction on account of Babul's status as an alien who will be removed from the United States as soon as he is released from prison. Babul observes that his impending removal will preclude any possibility of early release from prison to a half-way house and may change the mix of programs and services offered while he is in prison.

Before *United States v. Booker*, 543 U.S. 220 (2005), we had held that these differences never justify sentences below the appropriate ranges under the Sentencing Guidelines. See *United States v. Meza-Urtado*, 351 F.3d 301 (7th Cir. 2004). Now that the Guidelines are advisory, however, Babul maintains that he is entitled to a reduction to avoid unwarranted disparities between the effective punishment meted out to citizens and the punishment of aliens. See 18 U.S.C. §3553(a)(6). This line of argument does not reckon with *United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006), which observed that sentences within the Guideline ranges are the surest way to comply with §3553(a)(6), for the Guidelines are designed to ensure like treatment of like situations, and thus to avoid unjustified disparities. Thus we held in *Boscarino* that "[a] sentence within a properly ascertained range . . . cannot be treated as unreasonable by reference to §3553(a)(6)." 437 F.3d at 638. The lack of an "alienage discount" promotes rather than undermines the objective of §3553(a)(6).

This is not to say that a district judge must sentence within the Guideline range in order to comply with

§3553(a)(6). Judges have more flexibility now than they did when we decided *Meza-Urtado*. Cf. *United States v. Gama-Gonzalez*, 469 F.3d 1109 (7th Cir. 2006). As we observed in *United States v. Mallon*, 345 F.3d 943 (7th Cir. 2003), under the Strasburg Convention most aliens are entitled to transfer to prisons in their home nations, where they will receive the benefit of any programs (and release opportunities) limited to citizens. Babul does not argue that he is ineligible for such a transfer. He remains in the United States by choice and cannot complain that he is serving the same sentence that would be meted out to a U.S. citizen for committing the same offense.

Whether that sentence has been determined correctly depends on the application of U.S.S.G. §2B1.1(b)(12)(A). Guideline 2B1.1 deals with fraud and theft offenses, and the principal determinant of offense severity is financial loss. Subsection (b)(1) is a table of loss amounts, with higher offense levels attached to higher losses. The demonstrable financial loss from Babul's scam was relatively low, producing a correspondingly low offense level by application of this table. The district court concluded, however, that one of the specific offense characteristics justified an increase. Subsection (b)(12)(A) provides for a minimum offense level of 14 if the offense involved "the conscious or reckless risk of death or serious bodily injury". The district judge concluded that putting 200 incompetent truck drivers on the road created such a risk and adjusted the offense level accordingly.

Whether "effectively untested" truck drivers is the same thing as "incompetent" truck drivers is an empirical question, on which the record is silent. *Does* Wisconsin's licensing system (or that of Illinois), when implemented honestly, ensure that drivers are safe? Or does anyone who applies eventually get a license (applicants may take the test over and over until they pass), leaving safety to be achieved in other ways—through supervision by

drivers' employers, or through the insurance and tort systems (drivers who build up records of moving violations and small accidents may be priced out of the market, through higher insurance premiums, before they cause death or serious injury on the road). States interfere with market-based means to achieve safety—assigned-risk pools and other devices keep accident-prone drivers on the road even when no private insurer is willing to accept the risk for a price the driver is willing to pay, and even repeat drunk drivers often are allowed back behind the wheel—so perhaps one must fall back on the licensure decision. Yet the fact that few people who want to drive have not been able to obtain licenses, and that more than 40,000 persons die in vehicular collisions annually, implies that the system falls short at filtering out bad drivers.

Whether evading the state's testing system creates an incremental risk of death or serious bodily injury is an empirical question, on which both sides of this litigation have remained silent. They have offered lawyers' arguments—talk about what *might be*, rather than data about what *is*. Yet data are readily available, either from comparing accident rates of licensed and unlicensed drivers or from analysis of the driving records of Babul's clients. Even if many of Babul's clients never found work as truck drivers, the rest drove for years before Babul was caught, convicted, and sentenced; if they are especially dangerous, this would show up in both public and private records (convictions for moving violations and insurance experience). Yet no one thought to examine these records.

Many parts of the Guidelines, in addition to statutes such as 18 U.S.C. §16(b), pose the question whether a particular activity creates a risk of bodily injury or death. Numbers rather than words must supply the answers. Yet time after time counsel provide only talk, as if a

classroom-style "it could be argued that . . ." were suffi-cient. Although pertinent data sometimes are available in governmental compilations or scholarly publications, and we have used what we could find, e.g., *United States v. Howze*, 343 F.3d 919 (7th Cir. 2003), usually we must rely on the records compiled in the district court. Lawyers' persistent failure to assemble data that bear on the evaluation of risks has led us to express frustration and call on the bar to be more diligent, and on the Sentencing Commission to quantify risks using its own databases. See, e.g., *United States v. Boyd*, No. 06-2431 (7th Cir. Jan. 30, 2007), slip op. 6-7; *United States v. Chambers*, No. 06-2405 (7th Cir. Jan. 9, 2007), slip op. 5-6. In this litigation, however, words will have to suffice.

Tempting as it is to say that the prosecutor, as the proponent of the increase under subsection (b)(12)(A), must lose because no data were presented, we do not think that fiddling with the burdens of production and persua-sion is a satisfactory solution. Judges are entitled to approach many empirical issues with a set of prior beliefs based on experience, and when the record is silent they may make decisions based on those priors. That incompe-tent drivers create risks of injury is a fact that no one contests; the annual death toll on the roads greatly exceeds the number of murders and military fatalities. Drivers who elect to use bribery and fraud to obtain licenses identify themselves as more likely to be incom-petent than drivers who obtain licenses the honest way.

Published studies conclude that unlicensed drivers are involved in substantially more collisions than licensed drivers. See, e.g., David J. DeYoung, Raymond C. Peck & Clifford J. Helander, *Estimating the exposure and fatal crash rates of suspended/revoked and unlicensed drivers in California*, 29 Accident Analysis & Prevention 17 (1997) (unlicensed drivers have 4.9 times as many fatal crashes apiece as licensed drivers, while people driving on sus-

pended or revoked licenses are "only" 3.7 times as likely as licensed drivers to be involved in fatal crashes). Although the published studies are limited to drivers of personal rather than commercial vehicles, and do not rule out the possibility that people who have valid personal licenses are competent truck drivers without holding valid commercial licenses, they provide support for a belief that all drivers who do not hold valid licenses pose extra risk of injury or death.

Subsection (b)(12)(A) speaks of "risk" rather than "substantial" or even "material" risk, and Babul's crime must have created *some* risk. The omission of qualifiers such as "substantial" makes sense. Guideline 2B1.1 as a whole deals with theft and fraud, crimes that generally cause only financial injury. When a fraud creates the risk of physical injury or death, a longer sentence is appropriate. The table of equivalence tells us that not much risk of physical injury is required: subsection (b)(12)(A) raises the offense level to 14, the same level that is appropriate for embezzling $70,000. (The base offense level under §2B1.1 is 6, to which extra levels are added as the loss increases. A loss between $70,000 and $120,000 adds 8 levels, for a total of 14.) A single death in a road accident imposes losses much greater than $70,000; many bodily injuries also exceed that level. Even a 1-in-50 chance of death or serious injury equates to a financial loss in the $70,000 range. Plunking 200 potentially incompetent drivers behind the wheel of heavy trucks readily could create much greater risks, so in the absence of evidence quantifying the danger the judge was entitled to invoke this enhancement. Babul's crime put strangers at greater risk than if he had pilfered $70,000 from a corporation's treasury. A sentence of 41 months cannot be thought unreasonably high. It may well be unduly favorable to Babul—for if the district court had treated as "loss" the $2,000 paid by each of his clients (on

the theory that they paid for commercial licenses but received only worthless paper), then the offense level would have been even higher.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*