**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0405n.06

No. 04-5620

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jun 03, 2009**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| CORNELIUS LOVETT BIRDSONG, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: MERRITT, GRIFFIN, and KETHLEDGE, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Cornelius Lovett Birdsong appeals his conviction by jury of one count of felon in possession of a firearm and sentence of 304 months of imprisonment and restitution. He contends that the government's manner of questioning witnesses and closing arguments were improper, the evidence was insufficient to establish his guilt, and the court plainly erred in finding that he was a career offender under the Sentencing Guidelines, ordering restitution, and treating the Guidelines as mandatory. For the reasons that follow, we affirm the conviction, application of the enhancement, and order of restitution, but vacate Birdsong's sentence and remand for re-sentencing under the advisory Guidelines scheme articulated in *United States v. Booker*, 543 U.S. 220 (2005).

I.

At trial, Nicole Watson testified that in the early morning hours of April 6, 2003, Birdsong, her estranged husband of two weeks, entered her home with a duplicate key and appeared in her bedroom doorway while she laid in bed. When Watson asked Birdsong how he entered her home, he replied, "Bitch, you playing with me, and I'm fixing to kill you." He then grabbed the phone from her, pulled out a gun, and shot at her. Watson dodged the bullet by rolling over in her bed, and when Birdsong attempted to fire the gun again, it jammed.

Watson fled downstairs, but Birdsong caught her at the bottom of the steps, where he struck her with the gun on the back of her head. "He kept hitting me and kicking me and he told me that he knew I was going to call the police and he knew that he was going to go back to the penitentiary, so he was going to kill me," Watson testified. She managed to escape through the back door and ran to her neighbor's residence where she called 9-1-1. After the police interviewed her, Watson stayed with her mother for two weeks, during which time she had the locks to her home changed.

According to Watson, the gun Birdsong used was her automatic firearm which she purchased at his request and stored beneath her bed mattress. Three or four days after Birdsong moved out, she noticed the gun was missing and reported it stolen. Watson testified that the gun Birdsong fired "had to be" her gun because "he took my gun when I asked him to leave my house. Don't nobody know where my gun was but Cornelius [Birdsong]."

In 1998, Birdsong was charged in state court with committing aggravated assault against Watson and the couple's minor son. However, the charge was dismissed when Watson refused to testify. "I was scared. [Birdsong] was already incarcerated, [and] he told me if he had . . . to do any

- 2 -

time . . that he would kill me and my family," she testified in the district court. The state trial judge held Watson in contempt of court and ordered her incarcerated for ten days because she refused to respond to his question asking whether she loved her husband more than her son.

Officer David Allen of the Chattanooga Police Department testified that while handling an unrelated complaint near Watson's home on the evening of April 6, 2003, he observed "an individual in a brown jacket standing on the porch" at Watson's address. At the time, Allen "didn't think anything of it." After resolving another complaint in the area, Allen and his trainee, Officer Tammy Cook, were dispatched to a "disorderly with a weapon" at Watson's address. As Cook interviewed Watson, Allen went upstairs and saw a shell casing on the bed.

The following evening, the officers, accompanied by Watson, returned to the home. They collected the shell casing and saw a bullet hole in Watson's mattress where she "would have been laying her head at." Allen retrieved the bullet from the box spring in which it was lodged. He also found an unfired projectile beneath the air conditioner where Watson said that defendant had attempted to shoot her a second time when the gun misfired. Allen testified that he was familiar with automatic weapons and that the evidence was consistent with Watson's story that someone fired a shot, tried to fire another shot but the gun misfired, and re-racked the gun by ejecting the misfired bullet.

Officer Cook testified that on the evening of April 6, 2003, while responding to an unrelated call, she observed at Watson's address "a large black male standing on the back stoop, and he was wearing like a three-quarter length brown jacket and he had braided hair. He was large in stature."

When she responded to the disturbance at Watson's home, Cook found Watson dressed in "sleeping clothes" and

> standing in the kitchen area and she was very upset. She was crying. And she was disorganized in her thought . . . and in telling us what all had transpired there. And she told us that I believe she called him her husband, although, I was under the impression that they weren't exactly living together and had a working marriage, had c[o]me there at some point while she was asleep and came up into her bedroom and pulled out a gun on her and shot at her.

When Cook entered Watson's bedroom, she observed a shell casing on the mattress and smelled gun powder. Cook also noticed that the telephone was torn out of the wall.

Special Agent Steven Gordy of the Bureau of Alcohol, Tobacco, Firearms, and Explosives confirmed with the Chattanooga Housing Authority that Watson had her locks changed on April 9, 2003. The work order from the Housing Authority, which was admitted into evidence, indicated that changing the locks was a "priority emergency." Gordy also verified that the firearm Watson owned was a Hi-Point Model CF .380 caliber semi-automatic pistol that was manufactured outside Tennessee.

Gordy reviewed the evidence recovered from the scene and concluded that the gun fired and then misfired, at which time it was re-racked, causing the unfired bullet to be ejected. The markings on the unfired bullet indicated that it had been stovepiped, meaning that the gun had misfired. The firearms identification report from the Tennessee Bureau of Investigation reported that the shell casing and fired bullet were chambered in, and extracted from, the same firearm. The bullet and shell casing were consistent with those used in a ".380 auto caliber" pistol and contained rifling characteristics common to the Hi-Point brand of firearm (among others).

Mary Townsend, Watson's neighbor, testified that on the night in question, Watson "came out of the door and said she was going to her aunt's house to call the police, but she didn't have a coat on or nothing and it was sort of cold . . . ." Watson had tears in her eyes and told Townsend that "he had jumped on her."

Suelinda Soto, Birdsong's girlfriend at the time of the incident, testified on his behalf. She stated that defendant was with her and her four children at the time of the alleged crime. However, Soto conceded that she lied in state court hearings when she testified that Birdsong's friend, Richonda Owsley, babysat her children while she and Birdsong went out that evening. Soto also stated that Owsley lied as well. The truth, according to Soto, was that she and Birdsong stayed at her residence on the night of the alleged incident and did not go anywhere. Soto explained that she previously misrepresented the facts because "it just made the case look a little better since it was his word against hers," and Birdsong told her that "he needed two alibis to make his case stronger." She also conceded on cross-examination that defendant was not with her the entire time that night; rather, he told her that he "had to take care of some business," left, and returned at about 3:00 a.m. According to Soto, defendant's car was missing a license plate the next morning.

Birdsong's parole officer, Rhonda Rogers, testified that on the morning of April 7, 2003, Birdsong called her and "said that he wanted to tell me about an incident that had happened over the weekend." According to Rogers, defendant explained that

> he went to his wife Nicole Watson's apartment and found her with someone else, and he said that the dude ran out the back door, he said he told Nicole that he was through with her and was leaving and that she pulled a gun on him. He said he swatted her hand and the gun went off and into the bed. He said he ran down the steps and out

the door, just kept on running because she had shot at him before. He said he left his mother's car sitting there and snuck back later to get the car.

Upon Rogers's inquiry, Birdsong denied that he "put his hands" on Watson except when he swatted the gun away. His purpose in contacting Rogers about the incident was "in case [she] got a call from someone else." When Rogers interviewed Watson about the incident on April 7, 2003, Watson provided the same details as her trial testimony.

The parties stipulated that Birdsong was convicted previously of a felony offense and that the firearm and ammunition were manufactured outside of Tennessee and had been shipped in and affected interstate commerce.

The jury found Birdsong guilty of one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[1] The court sentenced him to 304 months of imprisonment and ordered him to pay restitution to Watson in the amount of $194, the value of the firearm. Birdsong timely appeals.

## II.

Birdsong contends that the prosecutor "engaged in pervasive misconduct throughout the trial process, from examination of witnesses through closing arguments," the result of which denied him a fair trial.

---

[1]Section 922(g)(1) makes it "unlawful for any person – who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition[.]"

Because Birdsong did not object to any of the alleged improprieties, we review them for plain error.[2] *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). Under the plain-error standard, he "must show (1) error (2) that was obvious or clear (3) that affected [his] substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Phillips*, 516 F.3d 479, 487 (6th Cir. 2008) (citation and quotation marks omitted). For a plain error to "affect substantial rights" means, "in most cases . . . that the error . . . must have affected the outcome" of the trial. *United States v. Olano*, 507 U.S. 725, 734 (1993). Thus, Birdsong bears a heavy burden: "[t]he plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994) (internal quotation marks and citations omitted).

Moreover, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Jackson*, 473 F.3d 660, 670-71 (6th Cir. 2007) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)). In our two-part test for determining whether prosecutorial misconduct warrants a mistrial, we examine (1) whether the prosecutor's remarks were indeed improper and if

---

[2]In his brief, Birdsong incorrectly relies upon *United States v. Stover*, 474 F.3d 904, 914 (6th Cir. 2007), to advance his argument that the applicable standard of review is de novo. Defendant ignores the standard of review actually applied in *Stover*: "Since [defendant] did not object to the prosecutor's statements at trial, we will only reverse for plain error."

so, (2) whether they were flagrant. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). "[W]e are mindful of a trial court's superior ability to assess aspects of an argument such as delivery and context." *Jackson*, 473 F.3d at 672.

## A.

Birdsong alleges five improprieties during the prosecutor's closing argument: (1) vouching for the veracity of a witness; (2) referring to evidence of defendant's "other bad acts" that was not in the record; (3) characterizing the parties' stipulations as proving conclusively the elements required for conviction; (4) arguing that, in order to acquit defendant, the jury had to find that the government's witnesses were liars; and (5) arguing facts not in evidence or which could be reasonably inferred from the evidence. Birdsong also contends that the cumulative effects of each alleged impropriety denied him a fair trial.

## 1.

Defendant first complains that the government inappropriately vouched for the veracity of its main witness – Nicole Watson – when the prosecutor remarked during closing argument that "[s]he stood up by herself every time and told the truth"; "[s]he was brave enough to come forward and tell you the truth this time about this incident"; "Ms. Watson has told the truth every time"; and "[s]he doesn't need to strengthen her story because she's telling the truth." We have defined "improper vouching" of a government witness as follows:

> Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness. Improper vouching

> involves either blunt comments or comments that imply that the prosecutor has *special knowledge* of facts not in front of the jury[.]

*United States v. Trujillo*, 376 F.3d 593, 607-08 (6th Cir. 2004) (quoting *United States v. Martinez*, 253 F.3d 251, 253-54 (6th Cir. 2001)) (citation and internal quotation marks omitted) (emphasis added).

The district court did not plainly err in failing to sua sponte strike the prosecutor's statements or order a mistrial. Nowhere in his argument did the prosecutor imply that he personally believed Watson, place his personal reputation as a government attorney behind Watson's testimony, or suggest that he had special knowledge of evidence not before the jury that demonstrated Watson's truthfulness. Furthermore, the district court gave the jury the standard cautionary instruction that the attorneys' arguments were not evidence.

Finally, because the jury was tasked with determining the truth, it *expected* counsel for both parties to vigorously advocate their clients' credibility in this adversarial proceeding. Many a case turns on the believability of witnesses, and the advocate's duty to his client is to argue the credibility of witnesses before the jury deliberates. *See United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989) ("[P]rosecutors, as well as defense lawyers, may and *must* argue as to the credibility of witnesses, and in a case of this kind the issue of credibility is critical. The very nature of a closing argument requires a detailed analysis of the testimony of each witness and the inferences to be drawn from the evidence") (emphasis added).

2.

Next, Birdsong contends that the government improperly "used 404(b) evidence that was never even introduced as evidence to sway the jury to guilt." The evidence to which defendant refers was his alleged assault against Watson and the couple's son in 1998. Defendant argues that "[t]hese facts were not in evidence, and even if they were, they should not have been used in closing to attempt to prove guilt. The charges were dismissed at the state level, and the affiant was prosecuted for contempt of court for being untruthful."

Defendant's assertion that the facts relating to the 1998 alleged assault were not in evidence is inaccurate. Without objection, Watson *testified* on direct examination about the alleged incident in 1998. Specifically, she stated that defendant was charged with aggravated assault because he "beat up my son and beat up me[,]" she refused to testify against defendant because he allegedly warned her that "if he had to do any time . . . that he would kill me and my family[,]" she served ten days in jail because she refused to answer the judge's question asking whether she loved defendant more than her son, and the charge against defendant was thereafter dismissed. Defense counsel then cross-examined Watson about the 1998 incident, suggesting in her questioning that Watson was imprisoned because she lied in her sworn statement. She also questioned Watson about the document charging her with contempt and required Watson to confirm that she pled guilty to lying in a sworn statement and was imprisoned for ten days. Finally, at defense counsel's request, and without objection, the court admitted into evidence the charge and the guilty plea. Given this record, Birdsong's contention that the facts relating to the 1998 incident "were not in evidence" is mistaken.

Moreover, an analysis of the context in which the prosecutor referenced the 1998 incident

demonstrates that his remarks were not plainly erroneous. In the evidentiary context, Rule 404(b)

of the Federal Rules of Evidence prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove

the character of a person in order to show action in conformity therewith." The rule, however, does

permit such evidence "for other purposes[.]" In his closing argument, the prosecutor did not refer

to the 1998 incident for the purpose of prejudicing the jury; rather, the prosecutor raised it as a

legitimate countermeasure to defendant's central theory that Watson "was lying then just as she is

lying now":

> [Defense counsel] is going to say that . . . in 1998, [Watson] went to jail for 10 days
> on a contempt charge because she refused to follow through and prosecute Mr.
> Birdsong. She's going to tell you she lied then. The judge is going to tell you when
> you're evaluating this evidence and listening to the law, to use your common sense.
> I will ask you to do that, please. You saw Ms. Watson. You heard about the '98
> episode and what was alleged that Mr. Birdsong did; beating her child, threatening
> her child, threatening to kill her, using brass knuckles. She was scared. Do not hold
> the fact she was scared in 1998 and backed out of a charge against Mr. Birdsong
> against her now. She was brave enough to come forward and tell you the truth this
> time about this incident. Do not hold the fact that it's taken her that long to get that
> courage against her.

The prosecutor's allusion to the 1998 incident then was not an assault on Birdsong's character to

demonstrate his guilt; instead, the prosecutor merely sought to explain why Watson refused to testify

in that prior proceeding and why the jury should not adopt defendant's theory that she lied in the

present proceeding just as she lied in 1998.

3.

Birdsong also complains that the government erroneously argued to the jury that it did not need to find the elements of the offense to which the parties stipulated were proved. "Although referring to the stipulations themselves was not [im]proper," defendant maintains, "it was improper to tell the jury they [sic] didn't need to find those elements for the conviction."

Defendant cites no authority supporting his contention that the district court's failure to sua sponte correct the prosecutor's statements regarding the stipulations was erroneous, much less plainly erroneous. In *United States v. Jones*, 108 F.3d 668 (6th Cir. 1997) (en banc), we considered whether the district court plainly erred by instructing the jury in a felon-in-possession-of-a-firearm case that

> [d]efendant admits that he was convicted of a felony prior to the date alleged in the indictment, so this element of the offense has been proven. Since defendant admits that he was previously convicted of a felony, *you will find that the government has established this element of the offense*, and you will proceed to determine if the government has proven the remaining elements of the offense.

*Id*. at 670.

In *Jones*, we assumed for purposes of our plain-error analysis that the district court erred in giving the instruction but held that the error was not plain and did not affect the defendant's substantial rights because the defendant failed to show that the instruction prejudiced him. *Id*. at 672. Specifically, our en banc court explained that "it would be nearly impossible to establish that the 'erroneous' instruction affected the outcome of the trial when [defendant] stipulated to his convicted-felon status, testified about his convictions on the stand, and clearly proceeded at trial on the theory that he was a convicted felon but that he never possessed a firearm." *Id*. Moreover, we

held that even if the defendant showed that the error was plain and affected his substantial rights, "we would stay our hand in the exercise of our discretionary power in this case" because no "miscarriage of justice" resulted in that there was "no possibility" that the defendant was actually innocent and the alleged error had not "seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id*. at 673.

Here, the only element of the crime that Birdsong challenged at trial and in this appeal regarding the sufficiency of the evidence was the element requiring the jury to find that he possessed a firearm. He did not at trial and he does not now contend that the evidence was insufficient to support the jury's findings of guilt on the jurisdictional and "convicted felon" elements, to which the challenged closing arguments related. Moreover, the alleged error in *Jones* was more serious than in this case because it concerned an instruction by the *judge*. Here, the alleged error was mere *argument* by the prosecutor. Birdsong does not contend that the judge's instructions to the jury were infected by the prosecutor's allegedly improper arguments. Indeed, we presume that the jury followed the court's instructions. *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000).

Even assuming, as we did in *Jones*, that the court plainly erred by not sua sponte correcting the prosecutor's arguments, the error did not affect defendant's substantial rights and does not warrant invocation of our discretionary powers because the jury's finding of guilt on the elements at issue would not have changed, and Birdsong's stipulations conclusively demonstrate that he was not actually innocent of those elements.

4.

Birdsong next contends that "[i]t was also improper to tell the jury that in order for them to acquit [him], they [sic] needed to make a finding that the police officers were liars." Defendant bases his contention on the prosecutor's argument to the jury that "[i]f you think that Agent Gordy, Officer Cook, Officer Allen, Nicole Watson, Parole Officer Rhonda Rogers, all got up there and lied, acquit this man."

Again, Birdsong misstates the prosecutor's argument. The prosecutor did not "tell the jury that in order to acquit [him], they [sic] needed to make a finding that the police officers were liars"; rather, the prosecutor argued that if the jury disbelieved the government's witnesses, it should acquit him. The prosecutor followed his argument by stating: "If, however, you believe them, then the proof against this defendant is overwhelming, it is clear that he did possess that gun." The argument was neither improper nor inaccurate. Moreover, the district court properly instructed the jury that arguments by counsel were neither evidence in the case nor statements of the applicable law, and we presume that the jury followed those instructions. *Hofbauer*, 228 F.3d at 706.

5.

Birdsong contends that the government improperly argued facts that were not in evidence. Specifically, he complains that the prosecutor remarked that Birdsong "obtained two witnesses, and asked them to lie for him" and that he was "running around trying to find people to lie for him."

Contrary to defendant's characterization of the statements as arguing "facts not in evidence," the statements were, in fact, accurate. Defendant's own witness, Suelinda Soto, testified that she and Richonda Owsley lied on behalf of and at the direction of Birdsong during state court hearings. Soto

explained that she lied because "it just made the case look a little better since it was his word against hers" and conceded that Birdsong told her to lie because "he needed two alibis to make his case stronger."

Because the challenged argument was accurately based on actual testimony by defendant's own witness, there was no error.

6.

Finally, Birdsong contends that the cumulative effect of the allegedly improper arguments violated his right to a fair trial. However, while "trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered cumulatively, require reversal of a conviction[,]" *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004), the converse is also true: "the accumulation of non-errors cannot collectively amount to a violation of due process." *Id*. (citation omitted). Because defendant has not demonstrated error, he fails to show that the accumulation of these "non-errors" warrants relief.

B.

Birdsong alleges four improprieties during the government's examination of witnesses: (1) asking leading questions of Watson; (2) the prosecutor acting as a "de facto witness"; (3) eliciting testimony without a foundation; and (4) Officer Cook testifying about double hearsay. As with the alleged improper closing arguments, defendant failed to object to any of the alleged improprieties in the government's examination of witnesses, and we accordingly review them for plain error. *Henry*, 545 F.3d at 376.

1.

Birdsong contends that the government improperly questioned Watson by "suggesting many of her answers" in leading questions. He highlights the following questions asked on direct examination: "So, you thought he was too controlling, is that right?"; "Mr. Birdsong couldn't be on the lease because he's a felon?"; "And they say on [the keys] 'do not duplicate,' is that right?"; "But he couldn't buy [a gun] because of his felony record, right?" Birdsong complains that on re-direct, instead of merely refreshing Watson's recollection of her prior statements, the prosecutor "simply read the statements into the record, and then asked 'is that right' or 'Remember testifying to that?'"

The alleged improprieties do not constitute plain error because leading questions are not per se prohibited on direct examination, the record demonstrates that such questions may have been appropriate in this case, and defendant does not show prejudice. We have stated that "[i]t is well recognized that the use of leading questions during the direct examination of a witness falls within the sound discretion of the trial court." *United States v. Shoupe*, 548 F.2d 636, 641 (6th Cir. 1977) (citing 3 Wigmore, EVIDENCE § 770 at 157 (1970)); *see also* FED. R. EVID. 611(c) ("Leading questions should not be used on the direct examination of a witness *except as may be necessary to develop the witness' testimony*") (emphasis added).

Among the categories of witnesses for whom leading questions may be appropriate on direct examination are "frightened" witnesses. *See Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2005). At trial, Watson testified that she was "scared." According to her testimony, defendant previously threatened to kill her and her family if she testified against him in a prior proceeding. Allegedly,

Watson was so afraid of Birdsong in that proceeding that she refused to testify against him, opting instead to defy the trial judge and serve ten days in jail because of it. It was thus not plainly erroneous for the trial judge, who was uniquely positioned to assess Watson's appearance and demeanor at trial, to permit the prosecutor to lead her on direct examination.

Moreover, defendant does not complain about the *substance* of the questions or contend that the information contained within them was inaccurate; rather, his argument goes merely to the *form* of the questions. In *United States v. Meza-Urtado*, 351 F.3d 301 (7th Cir. 2003), the Seventh Circuit aptly explained why such an argument cannot survive the plain error standard of review:

> [A]n objection to a question as "leading" is only an objection to the "form" of the question. If an objection is offered and sustained, the examiner simply rephrases the question and draws the desired information from the witness. Any reasonably good lawyer worth his salt can accomplish this little trick. Without a sustained objection, an examiner would never have a chance to rephrase his question. For this reason, we think error, plain or otherwise, could *never* be identified in a case where only the form of a question to which no objection is made is challenged on appeal.

*Id*. at 303 (emphasis added).

Finally, the questions had little bearing on the controverted element of the crime – possession of a firearm. *See United States v. Chalkias*, 971 F.2d 1206, 1213 (6th Cir. 1992) (stating that challenged questions were prejudicial only if they "contributed to the jury's determination of guilt") (quoting *United States v. Garcia*, 866 F.2d 147, 153 (6th Cir. 1989)). The questions about defendant being "controlling" and whether the keys to Watson's home were labeled "do not duplicate" were unrelated to, or were at least remotely tangential to, the central issue of whether defendant possessed a firearm. Regarding the allegedly improper refreshing of Watson's prior statements, Birdsong's

appellate brief fails to provide a record citation for them and does not even identify the statements so as to permit proper review. Accordingly, we deem the issue forfeited. *See United States v. Sandridge*, 385 F.3d 1032, 1035-36 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). The two questions referring to defendant's status as a felon were merely cumulative of the parties' stipulation that defendant was a convicted felon and therefore not plainly erroneous. *Chalkias*, 971 F.2d at 1212-13 (holding that leading questions relating to other incidents of drug activity were cumulative of evidence in the record and were not plainly erroneous).

2.

Next, Birdsong contends that the prosecutor "acted as a de facto witness, injecting himself (and placing his reputation and prestige) into the trial process" when, during rebuttal, he asked Agent Gordy questions using the first-person plurals "we" and "us," thereby "indicating that the [prosecutor] was a witness to certain conduct." The prosecutor asked leading questions of Agent Gordy, suggesting that he (the prosecutor) and Agent Gordy previously interviewed Soto and Owsley and that during that conversation, Soto changed her story and admitted that she lied.

While the form and substance of these questions are troublesome, they were merely cumulative of Soto's prior testimony. In that testimony, which immediately preceded Agent Gordy's testimony, Soto already *admitted* that she lied. The government's examination of Gordy was merely intended to further emphasize that point. Therefore, any advantage that accrued to the government

by the prosecutor's questioning was slight and did not prejudice defendant to the degree necessary to justify reversing his conviction under the plain error standard of review.

3.

Birdsong also contends that the district court erroneously permitted Agent Gordy to testify about a document – the work order to change Watson's lock – without foundation. He further asserts that "Gordy testified as to numerous facts for which he had no first hand knowledge."

Regarding the work order, defendant's complaint about lack of foundation is conclusory; he provides no argument to support his conclusion. Likewise, with respect to Agent Gordy's testimony, defendant fails to articulate those facts or argue how Gordy's testimony about them was plainly erroneous. Under the highly deferential plain error standard, we deem these issues forfeited. *Sandridge*, 385 F.3d at 1035-36.

4.

Finally, Birdsong complains that the prosecutor "introduced double hearsay from witness Cook. Officer Cook testified as to statements allegedly made by [defendant] which were related to Cook through yet another witness, Ms. Watson."

Defendant's two-sentence paragraph, without any quote of the objectionable testimony, argument, or citation to authority, again warrants no analysis, and we hold the issue forfeited. Moreover, Officer Cook's testimony about statements defendant allegedly made to Watson was cumulative of Watson's own non-hearsay testimony about what Birdsong allegedly told her at the scene of the alleged attack and, therefore, not plainly erroneous.

III.

Defendant contends that the evidence was insufficient to prove that he possessed the firearm alleged in the indictment.

"A defendant mounting a sufficiency challenge bears a heavy burden, because he must show that, 'after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]'" *United States v. Kimbrel*, 532 F.3d 461, 465 (6th Cir. 2008) (internal citation and quotation marks omitted). "That burden . . . is still heavier here" because Birdsong failed to move for an acquittal at the close of all the proof. *Id*. Therefore, he must show a "manifest miscarriage of justice," which, in this context, means he must demonstrate that "the record is devoid of evidence pointing to guilt." *Id*. (quoting *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998)).

Birdsong cannot overcome his burden. His sufficiency challenge rests upon a single ground: that he never possessed the Hi-Point .380 caliber model CF380, semi-automatic pistol that was alleged in the indictment. In other words, Birdsong maintains that even if he possessed a firearm, the government failed to prove that it was a Hi-Point .380. In support of his argument, he relies upon Watson's testimony that she "couldn't tell [the firearm] was mine . . . ."

However, the evidence overwhelmingly demonstrated that Birdsong not only possessed *a* firearm but that the firearm he possessed was a Hi-Point .380, the same firearm charged in the indictment. The evidence showed that Watson purchased a Hi-Point .380 firearm. She testified that a few days after defendant moved out of her home, her gun became missing, and she reported it

stolen. She was certain that defendant took the gun because "[d]on't nobody know where my gun was but Cornelius [Birdsong]." She testified that when defendant shot at her, he "had my gun." "It had to be mine," she reasoned.

The evidence taken from the scene supports Watson's conclusion. That evidence included a .380 bullet that had been fired into Watson's bed where she was allegedly lying when defendant attempted to shoot her. The bullet and shell casing that were recovered were consistent with those used in a .380 automatic caliber pistol. The forensic examination of the bullet and shell casing revealed that they contained "rifling characteristics" common to the Hi-Point brand of firearm.

The evidence also sufficiently identified Birdsong as the perpetrator and supported Watson's version of events. Watson's testimony about defendant's attire on April 6, 2003, was corroborated by the testimony of Officers Allen and Cook, who observed a man on Watson's back porch that evening prior to the attack. The jury heard Watson's testimony about the alleged incident and her 9-1-1 call. The evidence, including the smell of gun powder, the telephone that was torn out of the wall, the "priority emergency" work order to change Watson's locks, the witness testimony that Watson was "very upset" and crying after the incident, and the bullet and shell casing evidence all corroborated Watson's story. In fact, contrary to Soto's testimony that defendant was with her at the time of the incident, defendant *admitted* to his probation officer that he was at Watson's apartment and involved in an altercation with her that evening. Indeed, his duplicate key to the home was found on Watson's bed.

Based on this overwhelming evidence, the trial record is hardly "devoid of evidence pointing to guilt," *Abdullah*, 162 F.3d at 903 (internal quotation marks omitted), and Birdsong's insufficiency argument fails.

IV.

Next, Birdsong contends that the district court erred in classifying him as a "career offender" under United States Sentencing Guidelines § 4B1.1 when it calculated the applicable Guidelines range.[3] Relying upon a 2007 amendment to U.S.S.G. § 4A1.2(a)(2) requiring "multiple sentences to be counted as a single sentence if they were imposed on the same day or if they resulted from crimes contained in the same charging instrument" if an intervening arrest did not occur, *United States v. Bailey*, 264 F. App'x 480, 483 (6th Cir. 2008) (discussing § 4A1.2(a)(2)), *cert. denied*, 128 S. Ct. 2949 (2008), he argues that § 4B1.1 was inapplicable because his six prior offenses were consolidated for sentencing, he was sentenced for all six convictions on the same date, four of the convictions resulted from one arrest, he pleaded guilty to all six crimes, and "there is no indication, in any of the cases, as to the ultimate crimes of disposition."

Defendant's argument is factually and legally erroneous. The district court did not classify him as a "career offender" under § 4B1.1; rather, it classified him as an "*armed* career criminal" under § 4B1.4. Section 4B1.4 applies to "[a] defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e)." § 4B1.4(a). A defendant is subject to an enhanced sentence under § 924(e) when he has violated § 922(g) (felon in possession) and has "three previous

---

[3]The 2003 version of the Sentencing Guidelines applied.

convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious

drug offense, or both, committed on occasions different from one another[.]" § 924(e)(1).

Defendant does not dispute that his six prior convictions for selling cocaine and crack cocaine

qualified as "serious drug offenses." *See* § 924(e)(2)(A)(ii) ("[T]he term 'serious drug offense'

means – an offense under State law, involving . . . distributing, or possessing with intent to . . .

distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or

more is prescribed by law").

Therefore, his reliance upon the 2007 amendment to § 4A1.2(a)(2) is misplaced because the

amendment does not apply to the armed career criminal provisions of § 4B1.4. *See Bailey*, 264 F.

App'x at 483 (stating that the amendment does not "purport to alter the section of the Guidelines

dealing specifically with the sentencing of armed career criminals, let alone the ACCA [Armed

Career Criminal Act, § 924(e)]" ). Relying upon the "different schemes for calculating criminal

history under the Guidelines and for determining armed career criminal status under the ACCA[,]"

we explained in *Bailey* that unlike the Guidelines, the ACCA requires a prior conviction to "either

be counted in full as a predicate offense or not counted at all." *Id*. at 483-84. We also stated that

> even assuming that the Sentencing Commission had for some reason intended to alter the manner in which the ACCA is interpreted, the Commission cannot, by changing the Guidelines, alter a statute passed by Congress. This court has long held that the fact that multiple crimes are not separated by an arrest or that a defendant was sentenced for those crimes on the same day is not determinative of whether such offenses were committed on different occasions under the ACCA. *See United States v. White*, No. 05-6737, 2007 U.S. App. LEXIS 9704, 2007 WL 1217960, at *3 (6th Cir. Apr. 25, 2007) (unpublished) (collecting cases). Such precedent should not be overruled without some clear indication from Congress.

*Id*. at 484.

Apparently recognizing this distinction, defense counsel withdrew his objection to the armed career criminal enhancement at the sentencing hearing, acknowledging that while "[t]he sentencing guidelines take into consideration having been sentenced all at one time on predicate offenses[,] . . . [i]t just so happens that the statute for the armed career offender does not do that." Accordingly, we review the district court's decision to apply the enhancement for plain error. *United States v. Sanders*, 404 F.3d 980, 987 (6th Cir. 2005) (reviewing an ACCA enhancement for plain error).

Regarding Birdsong's complaint that the record contains "no indication . . . as to the ultimate crimes of disposition," the district court did not err in relying upon the presentence investigation report ("PSR") to determine whether defendant's prior convictions qualified for the armed career offender enhancement. Birdsong neither contends that he objected to the factual accuracy of the information contained in the PSR, nor does he make any specific challenge (beyond generalized speculation) to the correctness of any particular conviction identified in the report. *See United States v. Thomas*, 13 F. App'x 233, 241 (6th Cir. 2001) (holding no plain error in district court's reliance on the accuracy of the PSR to establish defendant's prior convictions under the ACCA where defendant failed to object to the PSR's "sufficiency or accurateness" and did not "produce[] any evidence which would call into question the existence or accuracy of the prior convictions as described in the . . . PSR").

Nor did the court err in applying the ACCA enhancement. The PSR identified six "serious drug crimes" that qualified as "predicate conviction[s] for the application of" the armed career

criminal enhancement. The dates of arrest for three of those convictions were: February 15, 1997, August 30, 1997, and November 18, 1997. For purposes of the enhancement, it matters not, as defendant erroneously contends, that all six prior convictions were consolidated for sentencing, for so long as the convictions were "based on separate criminal episodes[,]" the enhancement applies. *United States v. Hayes*, 951 F.2d 707, 708 (6th Cir. 1991).

Accordingly, the district court did not plainly err in applying the armed career criminal enhancement.

V.

Birdsong contends that the district court erred in ordering him to pay $194 in restitution to Watson for the loss of her gun. As grounds for his argument, he asserts that the crime of which he was convicted (possession of a firearm by a convicted felon) is not an offense for which mandatory restitution can be ordered under 18 U.S.C. § 3663A and that there was "no 'official victim' in this case for which to order restitution."

Although the government counters that restitution was appropriate under § 3663A, the applicability of that statute is questionable because the district court's restitution order was not based on that provision; rather, it was based on the discretionary restitution provisions in 18 U.S.C. §§ 3563 and 3583, which permit the sentencing court to order restitution as a condition of probation and supervised release. Significantly, § 3563(b)(2) (the probation statute) permits the court to order

defendant to "make restitution to a victim of the offense under section 3556[4] (*but not subject to the limitation of section 3663(a) or 3663A(c)(1)(A)*)." (emphasis added). In *Gall v. United States*, 21 F.3d 107 (6th Cir. 1994), we held that where restitution is imposed as a condition of probation, the probation statute overrides the limitations of § 3663. *Id*. at 110. Like the probation statute, § 3583 (the supervised release statute) permits the district court to order as a condition of supervised release "any condition set forth as a discretionary condition of probation in section 3563(b)." 18 U.S.C. § 3583(d).

We do not resolve the issue of whether the court's restitution order was permissible under the probation and supervised release statutes because defendant concedes that he did not raise it below, and we therefore review for plain error. Despite that demanding standard, defendant neither cited the correct statute on which the restitution order was based, nor did he cite any case law to support his argument that restitution was impermissible. He also failed to develop his argument beyond two conclusory sentences. Accordingly, we deem the issue forfeited. *Sandridge*, 385 F.3d at 1035-36.

Even if we addressed the issue on its merits, we would not grant defendant the relief he requests because where, as here, he "possessed" a firearm because he stole that particular firearm from the victim, a restitution order requiring him simply to reimburse the victim for the $194 value of the firearm that was never recovered is not plainly erroneous. *Cf. United States v. Donaby*, 349

---

[4] 18 U.S.C. § 3556 provides: "The court, in imposing a sentence on a defendant who has been found guilty of an offense shall order restitution in accordance with section 3663A, and may order restitution in accordance with section 3663."

F.3d 1046, 1054-55 (7th Cir. 2003) (rejecting the defendant's argument that restitution is limited to conduct fulfilling the elements of the crime and affirming restitution order for damage to a police car caused when defendant fled the scene of his bank robbery because it was a direct and proximate consequence of his criminal conduct).

VI.

Finally, Birdsong contends that the district court plainly erred under *Booker* by treating the Sentencing Guidelines as mandatory and requests that we remand the case for resentencing. The government agrees that a remand is necessary based on the district court's statement at sentencing that "I have limited discretion here."

Birdsong was sentenced in September 2004, prior to *Booker*, but *Booker* applies retroactively to all cases on direct review or which are not yet final and is therefore applicable to this case. *Booker*, 543 U.S. at 268; *United States v. Barnett*, 398 F.3d 516, 524 (6th Cir. 2005). Although a remand for resentencing is not per se required under *Booker*, 543 U.S. at 268 ("[W]e expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test"), the government concedes that a sentencing remand is warranted, and lack of prejudice to defendant cannot be presumed. *See Barnett*, 398 F.3d at 531-32 (holding that plain error required resentencing where Guidelines were applied as mandatory).

Accordingly, we vacate the sentence and remand for resentencing under the advisory Guidelines scheme articulated in *Booker*.

VII.

We affirm Birdsong's conviction, application of the armed career criminal enhancement, and order of restitution, but vacate the sentence and remand for resentencing under the advisory Guidelines scheme articulated in *Booker*.